THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALFRED CAGE, Defendant-Appellant.

First District (2nd Division) No. 84—1623

Opinion filed August 12, 1986.

James J. Doherty, Public Defender, of Chicago (Donald S. Honchell, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Christopher J. Cummings and Michael J. Marovich, Assistant State's Attorneys, of counsel), for the People.

JUSTICE STAMOS delivered the opinion of the court:

Defendant was indicted on January 23, 1982, for the offenses of murder and armed robbery of 70-year-old Elmer Senf and 65-year-old Otto Ahl. The trial court declared defendant unfit for trial and remanded him to the custody of the Department of Mental Health and Developmental Disabilities on May 26, 1982. An order for restoration was entered on April 7, 1983, and defendant's jury trial began on May 30, 1984. The jury found defendant guilty as charged and, after a hearing in aggravation and mitigation, the trial court sentenced him to life imprisonment. On appeal, defendant argues he was denied his right to a fair trial when: (1) the judge failed to instruct the jury on the presumption of defendant's innocence and on the State's burden of proving defendant guilty beyond a reasonable doubt; (2) the judge denied defendant's proposed *voir dire* question addressing the fact that defendant did not have to prove himself not guilty; and when (3) the State informed the jury that defendant had sought self-defense and guilt-for-voluntary-manslaughter instructions. Defendant also argues that he was improperly convicted on two counts of armed robbery where only one act of taking occurred.

Between 3 and 3:30 p.m. on January 23, 1982, a customer and her daughter entered the Constant Comfort Shoe Store in downtown Chicago. The daughter discovered two part-time employees of the store, Elmer Senf, aged 70, and Otto Ahl, aged 65, wounded and lying on the floor. When the women went to the store next door to report what they had seen, one of the men there rushed back to the shoe store, saw the two wounded employees, and used the shoe store's telephone. Senf and Ahl died in the hospital later that afternoon.

A Cook County medical examiner testified at trial that each man died from being beaten on the back of the head with a blunt instrument. Evidence recovered at the scene included blood samples, five identifiable fingerprints, shoe prints, and a shoe measurer with blood consistent with that of Senf. Neither the finger nor shoe prints could be linked to defendant. The drawer of the cash register was found open and empty except for some change. Abut $150 was missing.

Two waitresses working in a delicatessen across the street from the shoe store testified that defendant had come into the restaurant around 3 p.m. that afternoon. He wore ragged clothes, smelled bad,

was sweating and acted nervous. He was served cake and coffee, and they watched him waste sugar, pat the cake and swing back and forth in his seat while he looked across the street toward the shoe store. A minute or two after he left without paying for his order, police cars and ambulances arrived at the shoe store. These women each later identified defendant in separate lineups and identified him again at trial.

Defendant was arrested on January 25, 1982, at the Pacific Garden Mission building on south State Street. During questioning, he told the police he had been on the south side at the time of the crimes. The detectives stopped questioning him when he became hostile and aggressive. The next morning, defendant stated he had been reading a book in the library at Randolph and Michigan from noon to four on the day of the crimes, but he could not remember the name of the book or where in the library he had been reading it. He later stated he had been in the shoe store for change when one of the men there brushed him and pushed him. A fight began and when another man in the store came to help, defendant knocked each man down with a shoe measuring device. Defendant told the police he then took a couple of dollars from the open cash register, walked across the street for cake and coffee, and returned to the Pacific Garden Mission building.

Defendant repeated this statement to an assistant State's Attorney, adding that he had entered the shoe store intending to buy some socks since it was cold. At first he also said that he was hit twice by the first man and once by the second man in the fight before he picked up the measuring instrument. Then defendant told the assistant State's Attorney that he had picked up the foot measurer after the first man hit him and that he had held it at his side during the struggle until, in the storage area of the store, he hit the first man twice with the measurer. Despite the medical reports indicating five wounds on the head of each man, the defendant insisted that, using an arching motion from the front, he had hit the first man in the back of the head only twice and the second man only three times.

At trial, defendant established that the rear door of the shoe store was discovered closed but not locked. A worker in a parking garage across the street from the store testified that he saw a man, not defendant, running north away from the shoe store. The police arrived quickly after that, and he did not know if the man could have been the man who called the police.

Defendant testified that he lived in the Pacific Garden Mission in

January of 1982 and that he had been out of work for quite a while. After his arrest, the police repeatedly told him he had committed the murder and that he was going to tell them how or he would get the death penalty. They also hit him but he did not state that he was involved in the incident. He did not know where the shoe store was. When he was exhausted, he went along with their story so that he could go back to the lockup. He denied killing the men or stealing the money and testified that he spent the day of January 23 at the bus station and the library, keeping warm. He went to the delicatessen, but left without paying since he had no money. From there, he went back to the library and then to the Pacific Garden Mission where he spent the night.

Neither defendant nor the State offered the trial court during the instruction conference an instruction on the presumption of defendant's innocence and on the State's burden of proof. The court did not on its own give this instruction to the jury. After deliberating, the jury returned with verdicts finding defendant guilty of murder and armed robbery. Defendant was sentenced to life imprisonment.

Defendant first contends that the trial court denied him a fair trial by failing to instruct the jury on the presumption of innocence and the State's burden of proving him guilty beyond a reasonable doubt. The State counters that such an instruction is not constitutionally mandated. It contends that defendant received a fair trial because the trial court told the jurors about the presumption of innocence and the burden of proof before *voir dire* began, and because during *voir dire* the venire heard questions about the fairness to be accorded defendant and heard references to the State's burden of proof.

 Initially, we note that, while a party who desires a specific instruction generally must offer it and request the court to give it (*People v. Nuccio* (1973), 54 Ill. 2d 39, 50, 294 N.E.2d 276), this rule is modified as to the instruction on the presumption of innocence and the question of burden of proof. Regarding these basic protections guaranteed the accused, the trial court bears the burden on its own motion of seeing that the jury is instructed. (*People v. Parks* (1976), 65 Ill. 2d 132, 137, 357 N.E.2d 487.) Failure to so instruct may not in and of itself violate the constitution. (*Kentucky v. Whorton* (1979), 441 U.S. 786, 60 L. Ed. 2d 640, 99 S. Ct. 2088.) However, the United States Supreme Court, referring to the fourteenth amendment due process clause safeguard against dilution of the precept that guilt must be established beyond a reasonable doubt, has

noted the special purpose of a presumption of innocence instruction in protecting an accused's constitutional rights. (*Taylor v. Kentucky* (1978), 436 U.S. 478, 486, 56 L. Ed. 2d 468, 475, 98 S. Ct. 1930, 1935.) Thus, the failure of a trial court to give the instruction must be evaluated in light of the totality of the circumstances of each case to determine whether the defendant received a constitutionally fair trial. *Kentucky v. Whorton* (1979), 441 U.S. 786, 789, 60 L. Ed. 2d 640, 643, 99 S. Ct. 2088, 2090.

■ Before *voir dire* began in the instant case, the trial judge told the prospective jurors that he would tell them certain things about the law that they must accept. He followed this by saying, "At the conclusion of this case, I will give you certain written instructions. You will go back to the jury room and follow these instructions. That's how you'll decide the case." He asked if everyone would follow the law as he gave it, described the charges against defendant, and told the venire it would not be involved in sentencing. He then stated that defendant was innocent until the State proved him guilty beyond a reasonable doubt and gave as an example that if the prospective jurors were asked to render a verdict without hearing evidence, they would have to return one of not guilty. The State characterizes these remarks as instruction on the presumption of innocence and the burden of proof. It adds that the trial court referred to the State's burden of proof during *voir dire* and asserts that the jury fully understood these principles. We disagree.

We have rejected similar arguments in *People v. Williams* (1983), 120 Ill. App. 3d 900, 458 N.E.2d 1312, *People v. Carpenter* (1981), 101 Ill. App. 3d 792, 428 N.E.2d 983 and *People v. Donald* (1974), 21 Ill. App. 3d 696, 315 N.E.2d 904. In each of these opinions, we noted that telling the jurors during *voir dire* that the applicable law was stated in the instructions, counteracted the trial court's explanation of the presumption of innocence and the burden of proof. The instant situation is analogous. The trial court first told the venire that he would tell them the law. He then immediately added that he would give them written instructions at the close of the case and told them that they would decide the case by following those written instructions.

Moreover, during the *voir dire*, the trial court cautioned prospective jurors who had served on other trials that they must decide the case strictly "on the law you hear here." The trial court told one juror, "You'll accept the law as I give it to you as opposed to something you might have heard in [the other criminal] case." He did not

give any law after each of these admonitions. Thus, as we found in analyzing the totality of the circumstances in *Williams, Carpenter,* and *Donald,* the impact of any statement during *voir dire* regarding the presumption of innocence and burden of proof was diminished. In effect, the jurors could have believed that they were to disregard statements made by the trial court prior to the written instructions.

Indeed, the State acknowledges this authority, but contends that our recent decision of *People v. Ayala* (1986), 142 Ill. App. 3d 93, 491 N.E.2d 154, supports finding that the content of *voir dire* is an important consideration in determining this issue. The circumstances here differ from those in *Ayala,* however. There, we noted that the trial court outlined and explained the fundamental principles of presumption of innocence and reasonable doubt. The impact of both outlining and explaining is not present here. More importantly, the *Ayala* trial court questioned each juror about the State's burden of proof and the juror's obligation if that burden was not sustained. The content and emphasis of the *voir dire* in the instant case does not match that in *Ayala.*

■ We are likewise unpersuaded by the State's argument that the trial was fair because the prospective jurors heard *voir dire* questions pertaining to the ability to treat defendant fairly. First, since the trial court posed the questions in terms of fairness to both sides, the special purpose, for the defendant's benefit, of the presumption of innocence instruction " 'to put away from their minds all the suspicion that arises from the arrest, the indictment, and the arraignment' " was not conveyed. (*Taylor v. Kentucky* (1978), 436 U.S. 478, 485, 56 L. Ed. 2d 468, 475, 98 S. Ct. 1930, 1934, quoting J. Wigmore, Evidence sec. 407.) Further, the trial court initially pointed out that the victims were white and the defendant was black, and that he would ask the venire whether this would affect the ability to give both sides a fair trial. A review of the record reveals that the majority of the court's references to fairness were, indeed, specifically linked to this inquiry regarding racial bias. Given the court's emphasis on this topic, it is unlikely that the venire thought of the presumption of defendant's innocence and of the State's burden each time the court asked a question regarding fairness.

■ The State's remaining arguments in support of its contention that the defendant was afforded a fair trial despite the omission of the instruction are also without merit. The State refers to defendant's mention of the principles during his opening and closing arguments. This is not persuasive in light of the holdings of *Carpenter*

and *Donald* that the statements and arguments of counsel do not have the same impact on jurors as do instructions. Furthermore, the jury was told during argument and was cautioned by instruction to use the law given by the trial court, rather than the law expressed by the attorneys.

■ The State also refers to the burden-of-proof language which the jury received in the issue instructions on murder, voluntary manslaughter and armed robbery. Yet this argument, too, was rejected in *Donald* and *Carpenter*. As we stated in *Carpenter*, references existing elsewhere in instructions that if certain propositions were proved beyond a reasonable doubt the jury could find defendant guilty are minimal statements of the State's burden. We find such references insufficient here.

■ Finally, the State urges that the overwhelming nature of the evidence proving defendant's guilt leads to the conclusion that the trial court's failure to give the instruction on innocence and reasonable doubt could not have affected the jury's verdict. Again, we rejected the same argument in *Williams* and *Carpenter*. In these cases, we found the evidence sufficient to sustain the convictions, but reversed and remanded nonetheless because the circumstances of each case indicated that omission of the instruction may have contributed to the verdict. Because we conclude that the judgment must be reversed and the cause remanded for a new trial, it is inappropriate for us to analyze the evidence in greater detail than necessary to resolve the issues we deem dispositive. (See *People v. Prather* (1985), 138 Ill. App. 3d 32, 40, 485 N.E.2d 430.) Without in any way indicating an opinion as to this defendant's guilt, we find that even if there was sufficient evidence to sustain the conviction, the error in failing to give the instruction requires reversal.

In view of the conclusions we have reached, we need not consider the defendant's other contentions on appeal. For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and remanded for a new trial.

Reversed and remanded.

HARTMAN and SCARIANO, JJ., concur.