(No. 43820.—<span></span>

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RICHARD NUCCIO, Appellant.

*Opinion filed March 20, 1973.*

GOLDENHERSH, J., took no part.

JAMES G. DEMOPOULOS, of Chicago (GEORGE B. COLLINS, JEFFREY SCHULMAN, and COLLINS & AMOS, of counsel), for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago (JAMES B. ZAGEL and MORTON E. FRIEDMAN, Assistant Attorneys General, and ELMER C. KISSANE, MARK T. ZUBOR and JAMES R. TRUSCHKE, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE WARD delivered the opinion of the court:

Richard Nuccio, who was a Chicago police officer at the time of the events described in this appeal, has appealed directly to this court after his conviction for murder in the circuit court of Cook County.

He complains that reversible error was committed by the trial court in allowing the prosecution 13 peremptory challenges, contrary to the provisions of section 115–4(e) of the Code of Criminal Procedure (Ill. Rev. Stat. 1969,

ch. 38, par. 115—4(e); that the court erroneously refused to question the jurors regarding allegations of jury "contamination" he made in a post-trial motion; that his trial was rendered unfair by prejudicial comments by the prosecutor in closing argument; that the prosecution knowingly offered false and prejudicial testimony; and that the evidence was insufficient to prove him guilty of murder beyond a reasonable doubt.

The defendant's trial took place in October, 1970, following our reversal in November, 1969, of an earlier conviction on the same charge (*People v. Nuccio, 43 Ill.2d 375*). Our reversal of that conviction, which followed a bench trial, was on the ground that unsupported, prejudicial insinuations against the defendant had erroneously been permitted. 43 Ill.2d 375, 395.

Language in our earlier opinion is applicable here:

"The testimony is voluminous and conflicting, with few matters undisputed. It is clear, however, that the event in question occurred on the night of June 4, 1968, in an alley near a large parking area opposite Wrigley Field in Chicago. This parking area was bounded on the north by Patterson Avenue, on the east by Clark Street, on the south by Addison Street, and on the west by an alley running diagonally north and south between Patterson Avenue and Addison Street. Near its mid-point this alley was intersected by an east-west alley, and the intersection of these two alleys was lighted by an overhead light attached to a pole. The Franksville Restaurant was located at the southwest corner of this parking area, and a Tastee-Freez Ice Cream stand was at the northeast end surrounded by parking area. Driveways led into the area from Patterson Avenue and from Clark and Madison Streets." 43 Ill.2d 375, 376-7.

At about 9:30 P.M. on June 4, 1968, the defendant and Ronald Rothmund, Chicago police officers, were on

patrol in a marked squad car when they received a radio report of a disturbance in the parking lot across from Wrigley Field. Answering the call, they drove into the parking area and parked the squad car near the ice-cream stand. They were joined by two other Chicago police officers, Ronald Hyatt and Joseph Sand, who had responded to the same radio message. Hyatt and Sand were in civilian clothes.

The defendant walked to a group of young persons who were standing in front of the Tastee Freez. There he searched John Ahrens, one of the group. Rothmund walked to the Franksville Restaurant where he met Ben Citron, its owner, who had phoned in the complaint which the police had come to investigate. Citron testified that he had observed Ronald Nelson sitting at one of the outside tables at his restaurant playing with a knife, and that he had called the police. Although Nelson was not causing any disturbance and the blade of the knife was not exposed, Citron testified that he was apprehensive, because several months earlier Nelson had created a disturbance in the restaurant and had struck him. Citron had filed a complaint against Nelson, and a juvenile court judge had ordered Nelson to stay away from the restaurant. Citron testified that when he called the police on this occasion he said only that some young persons were causing a disturbance. He did not say that a youth was in his restaurant in violation of the judge's order, nor did he mention the knife. Citron testified he did not tell Officer Rothmund about the knife when he met him at the door. He said that when he met Rothmund he pointed to a youth, Steven Austill, who was walking towards the southwest corner of the parking area, and said, "there's one"; he then pointed towards the table where Nelson was sitting, and said, "that's another one."

Both Rothmund and Citron, the latter a defense witness, testified that Nelson was alone at the table. Rothmund testified that he observed a knife with an

opened blade in Nelson's hands, but Citron could not recall seeing a knife in Nelson's possession at this time.

Trena Kelley, however, who was a 16-year-old high school senior at the time of the incident, testified that she was sitting at the table with Nelson when Citron spoke with Rothmund, that she observed Nelson's hands, that he was not holding a knife, and that she had not seen a knife in his possession any time that evening. Leonard Noe testified that he observed Nelson and Trena Kelley sitting together, that he noticed Nelson's hands and that Nelson did not have a knife.

After Citron pointed towards Nelson, Rothmund moved toward him. At that, Nelson jumped up and ran. Rothmund testified that he shouted, "Get him" or "Grab him." "Watch out, he has a knife" or "He's got a knife." Officers Sand and Hyatt and the defendant testified they heard Rothmund cry that Nelson had a knife. Citron, who had just re-entered the restaurant after pointing out Nelson, testified that he did not hear Rothmund say anything. Six other witnesses, who were called by the prosecution, testified that they heard Rothmund shout, "stop him," but that they did not hear him say anything about a knife. A seventh prosecution witness, Noel Kitchen, testified that he could not be certain whether Rothmund shouted "stop him" or "shoot him," but he was certain he had not heard him say that Nelson had a knife.

The defendant was searching John Ahrens, he said, when he heard Rothmund's shout. Officer Ronald Hyatt testified that he chased Nelson in a northwesterly direction until Nelson turned west into the east-west alley at the point of intersection between the north-south and east-west alleys. There the defendant joined in the chase. According to the testimony of Hyatt and the defendant, they were pursuing Nelson in the east-west alley, and when they were about 40 feet to the west of the junction of the two alleys, Hyatt noticed that Nelson was about to throw

a knife and shouted: "Watch out, he's going to throw the knife."

The defendant testified that Nelson turned to throw the knife and that as he released the knife he, the defendant, dropped almost to one knee, drawing his weapon as he did so, and fired. Nelson fell to the ground when the shot was fired, got up and started towards Hyatt and the defendant, and then collapsed. When the patrol wagon arrived, Nelson was placed on a stretcher and taken to the hospital. Hyatt testified that Nelson, who had been running at top speed, was in the act of running when he threw the knife. Hyatt also stated that the knife landed behind the defendant, and he picked it up. He identified a knife with a 3-to-3½-inch blade and a brown and tan handle as the one he had recovered.

Officer Rothmund testified that after he called to the other officers to stop Nelson, he turned in the opposite direction, and proceeded towards Steven Austill, and placed him under arrest. Rothmund did not witness the shooting.

Officer Joseph Sand testified that when he and Hyatt arrived in the area, he began searching a number of youths who were congregated about the Tastee Freez. He did not, he testified, see the defendant at that time. While he was conducting the searches, he said he heard Rothmund shout, "Stop him! Watch out, he has a knife." He did not see the shooting, though, as he had turned his attention back to the people he was searching after he heard Rothmund's shout. He did hear a shot, which he at first mistook for a firecracker, he said, but did not see who fired it. He never saw Officer Hyatt in the alley.

The officers who testified stated that they did not interview or attempt to interview any of the witnesses to the incident.

The prosecution presented twelve witnesses who testified that they heard Rothmund shout, "Stop him," that the defendant ran a few steps towards the intersection

of the north-south and east-west alleys, drew his revolver, took aim and fired when he was east of the junction of the two alleys. These witnesses testified also that they observed Nelson running, and declared that he did not turn around or throw a knife. The defendant's position when he fired was described by them as either a standing position or with his knees slightly bent. Other than the defendant and Hyatt, the six witnesses who had a view of the east-west alley testified that Nelson was the only person in it when he was shot.

Edward Shalagos, a physician and pathologist in the office of the coroner of Cook County, testified that he conducted an examination of Ronald Nelson's body on June 5, 1968. Before he conducted his examination, the witness had been given a description of how the shooting occurred by unidentified police officers. This account corresponded substantially to the testimony of Hyatt and the defendant at the trial. Dr. Shalagos stated that the trajectory of the bullet, which passed through the decedent's body and was never recovered, was "*** slightly downward and slightly toward the left." In the witness' opinion, "*** the gun was above, slightly above the level of the bullet wound in the back." When asked by the prosecutor, without objection by the defendant, whether his findings were "*** consistent or inconsistent with the facts that the police told [him] ***," Dr. Shalagos replied, "My findings were inconsistent."

The defendant's first claim of error is that the trial court allowed 13 peremptory challenges to the prosecution, three more than permitted by the governing provision of our statute. (Ill. Rev. Stat. 1969, ch. 38, par. 115—4(e).) Section 115—4(e) provides:

> "(e) A defendant tried alone shall be allowed 20 peremptory challenges in a capital case, 10 in a case in which the punishment may be imprisonment in the penitentiary, and 5 in all other cases ***. The State shall be allowed the same number of peremptory challenges ***."

The record shows that the *voir dire* examination of

prospective jurors began on October 13, 1970, and was completed on October 15, 1970. On the morning of October 15th the defendant made a motion to recall three of the panel, whom the State had excused on the previous day as its 11th, 12th, and 13th peremptory challenges. The defendant's argument was that each side was entitled to only ten peremptory challenges and that the three additional jurors excused by the State should be recalled for consideration as jurors. The State protested in the trial court, as it does in part here, that each side was entitled to twenty peremptory challenges, as murder is a capital offense.

After extended argument by counsel, which it is unnecessary to detail and weigh here, the trial court ruled for the defendant and held each side was entitled to ten challenges. The court, however, denied the motion to recall the three excused jurors, saying that the defendant had failed to make timely objection to the excusing of the jurors.

The defendant relies principally upon *Heald v. United States (10th cir. 1949), 175 F.2d 878,* to support his position. There, during the *voir dire* examination, the trial judge mistakenly informed the defendant that he had one peremptory challenge remaining and the defendant's counsel immediately excused a prospective juror. When the prosecution pointed out that the defendant had exhausted his challenges, the excused juror was recalled. The defendant objected to this, but did not examine the juror further to seek or challenge him for cause. In affirming the defendant's conviction, the court observed that a juror who had been recalled after having been peremptorily excused might be prejudiced against the party who had excused him. But the court held, and some may say unrealistically, that "[i]t is, of course, possible that [prejudice] could have resulted but it was their duty to search the mind of the juror, and to examine him in order to determine if any bias or prejudice existed on his part,

and having failed to do so they may not now be heard to complain." 175 F.2d at 882.

In *Heald* the prosecution's objection to the defendant's exercise of an unauthorized challenge was timely. The court there held only that the failure of the defendant to examine the recalled juror for resulting prejudice precluded him from protesting the juror's recall on appeal.

Here, the defendant failed to object to the excusing of the 11th, 12th, and 13th jurors until the following day, when he raised the question of the limits to peremptory challenges. We consider that the question whether to allow the motion to recall the jurors rested within the sound discretion of the trial court. Considering the circumstances, including the failure of the defendant to make timely objection, the denial of the motion was not an abuse of discretion.

Too, we would note parenthetically that the defendant does not challenge the composition of the jury finally selected. No claim is made that the refusal of the trial court to allow his motion to recall deprived him of a fair and impartial jury.

The defendant next complains of the refusal of the trial court to examine jurors to ascertain the truth of allegations of jury "contamination" made by the defendant several weeks after the return of the verdict and the entering of judgment. On November 30, 1970, the defendant filed a motion for a new trial, grounded on the claim that several of the jurors had discussed the fact that the defendant had been previously convicted on the same charge. Jurors named Weiss, Fisher, Adkins and Storcz were identified as the concerned jurors. In the affidavit accompanying the motion, Sherman Greene, an investigator employed by the defendant, stated that he had "read defendant's motion for a new trial with respect to his report of the jurors, and that the matters contained therein are matters which he reported to defendant's counsel as a result of interviews he had with several of the jurors."

A hearing was conducted on November 30, 1970, on the motion, and at it the defendant informed the court that he had subpoenaed the jurors concerned. He then asked the court to examine them regarding his allegation that they had discussed the defendant's previous conviction.

There was objection by the assistant State's Attorney, apparently on the ground that it was not claimed that the alleged conversations between the jurors took place prior to the reaching of the verdict. Greene then took the stand and testified that the juror Weiss had learned of the previous conviction after the jury's deliberations had been completed, and he said that Fisher had not recalled when he had learned from Weiss of the prior conviction. Greene was unable to remember when Adkins and Storcz had learned of the earlier conviction. Greene's testimony was concluded with the following question and answer:

"Q. And no juror ever told you that they discussed a former trial or former conviction during the deliberations ***.

A. Not in so many words."

The defendant's citation of *People v. Ortiz, 320 Ill. 205,* to support his position is inappropriate. There, this court observed: "It is the general rule that where a juror deceives or misleads a party by falsely testifying that he is unprejudiced or impartial, on discovery of the fact after a verdict a new trial will be ordered. [Citations.]" 320 Ill. at 213.

That question was not involved here. Rather, the defendant sought in effect to impeach the verdict of the jury by showing that it was influenced in its deliberations by prejudicial material not in evidence—namely, that the defendant had been convicted in an earlier prosecution. Although a showing that highly prejudicial material not in evidence was considered by a jury during its deliberations may cause a new trial to be ordered (*Marshall v. United States, 360 U.S. 310, 3 L. Ed. 2d 1250, 79 S. Ct. 1171*),

here it was not alleged or proved that the jurors, before reaching a verdict, discussed the defendant's prior conviction. The general rule is that jurors will not be permitted to impeach their verdict (*People v. Pulaski, 15 Ill.2d 291, 300*), and there was no reason here for the trial court to call jurors several weeks after the return of their verdict.

Another claim of the defendant is that he was prejudiced by improper comments of the prosecutor in closing argument. However, he objected to only one of the comments now complained of, and it is clear that a failure to object to argument at trial operates in general as a waiver of the right to object on appeal. (*People v. Donald, 29 Ill.2d 283, 287.*) We would add that the character of the comments was not "*** such as to require us to assess their possible effect despite the absence of objection. [Citation.]*" People v. Pearson, 52 Ill.2d 260, 269.*

The comments to which the defendant did object concerned a more or less collateral question of credibility. There was defense testimony that one of the State's witnesses, John Ahrens, and several other young persons had been involved in an altercation with the defendant at sometime prior to the shooting. The defendant and another police officer testified that Ahrens had struck the defendant with a board during this incident. Ahrens denied striking anyone. The officers testified that Ahrens had fled and that he had never been arrested or prosecuted for this conduct. In final argument, the assistant State's Attorney stated: "Ahrens didn't say anything about having a board. He never said he hit anybody. He said that he was never arrested for hitting the defendant. And yet one of the defense witnesses and the defendant say that John Ahrens hit the defendant with a board. If anyone hits a police officer with a board, that person is arrested immediately and that person is prosecuted. I'm a prosecutor. I know what happens in these cases." The defendant made an objection to the remarks, which was sustained.

We do not consider there was harmful error. What we said in *People v. Sawyer, 42 Ill.2d 294, 300,* may be

applied here: "*** we are of the opinion that in view of the prompt objection and the court's prompt ruling, there was no prejudicial error."

The complaint which charges the prosecution with the knowing use of perjured testimony is based upon the testimony of Leonard Noe, who was the first eyewitness for the prosecution. Noe testified that the defendant walked up to the decedent after he had shot him, searched his pockets, and then kicked him. Because all the other eyewitnesses denied having seen the defendant kick the decedent, it is argued that Noe's testimony was false and that the prosecution knew it was false. The defendant does not cite any authority to support the contention that a conclusion that the prosecutor knowingly used perjured testimony may be drawn solely from the circumstance that there was other contradictory testimony. We consider such a conclusion unwarranted. A similar contention was made in *People v. Moore, 42 Ill.2d 73, aff'd, 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562,* under resembling circumstances. We rejected the argument, saying at p. 81: "Such contradictions in testimony go to the weight of the evidence and do not in any way indicate perjury."

The final contention of the defendant is that the evidence was insufficient to prove him guilty of murder beyond a reasonable doubt. Incorporated in this contention is an argument that, at most, the State established the offense of voluntary manslaughter.

The argument that the evidence established the defendant's guilt, at most, of voluntary manslaughter cannot now be entertained. The defendant not only did not request that a manslaughter instruction be given, but he opposed the giving of such an instruction when it was proposed by the prosecutor. There is no error of which the defendant can complain on appeal. *People v. Taylor, 36 Ill.2d 483.*

We cannot accept the argument that the evidence was not sufficient to establish guilt of murder beyond a

reasonable doubt. Basically the defendant's position is that the evidence showed that he fired his gun in the belief that he was acting in self-defense. But the testimony of the prosecution's witnesses was that the defendant did not act in self-defense. The testimony of the defendant as to the circumstances of the shooting was inconsistent with the testimony of the pathologist who examined the path of the wound in Nelson's body.

We have said: "It is pecularily the province of the jury to weigh the evidence, judge the credibility of witnesses and determine the facts. A reviewing court will not set aside a jury's verdict of guilty unless the evidence is so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to cause a reasonable doubt as to the guilt of the accused. [Citations.]" *People v. Sumner, 43 Ill.2d 228, 232.*

This court cannot say that the evidence here is so palpably contrary to the verdict or so deficient as to cause a reasonable doubt of the defendant's guilt.

For the reasons given, the judgment is affirmed.

*Judgment affirmed.*

MR. JUSTICE GOLDENHERSH took no part in the consideration or decision of this case.