THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TERRANCE WILLIS, Defendant-Appellant.

First District (3rd Division)   No. 1—96—0697

Opinion filed October 28, 1998, *nunc pro tunc* September 23, 1998.

Timothy P. Nance, of Palos Hills, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Janet Powers Doyle, and Tyra Taylor-Bell, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BURKE delivered the opinion of the court:

Following a jury trial, defendant Terrance Willis was convicted and sentenced to 40 years' imprisonment for the attempted first degree murder of Demetrious McTizic, 10 years' imprisonment for the attempted first degree murder of Tyrone Rush, the sentences to run consecutively, and 30 years' imprisonment for armed violence, the sentence to run concurrently with defendant's 40-year sentence.[1] De-

---

[1] Defendant was also found guilty of two counts of aggravated battery with a firearm, which merged with his attempted murder convictions

fendant appeals his convictions and sentences, contending that: the trial court erred in allowing the jury to hear McTizic's and his doctor's testimony at the Cook County Hospital, the prejudicial effect of which deprived defendant of a fair trial; defendant was not proven guilty beyond a reasonable doubt of the attempted murder and aggravated battery with a firearm of McTizic and Rush, and armed violence against McTizic; and the trial court abused its discretion in sentencing defendant to consecutive sentences and an extended sentence. For the reasons set forth below, we affirm.

On July 27, 1994, defendant was arrested after a gang-related shooting incident and subsequently indicted. On December 11, 1995, defendant filed a motion *in limine* requesting that the trial court deny a motion by the State to allow McTizic's and his physician's testimony to be taken at the Cook County Hospital trauma ward. Defendant argued that he would be prejudiced by the taking of this testimony in the hospital because: McTizic's injuries would be "unduly highlighted without adding anything of probative value"; the jury would concentrate on McTizic's injuries more than on whether defendant was guilty or not guilty; "[b]y taking the extraordinary measure of transporting the jury to the hospital," the members of the jury would be given the impression that the injuries of the witness are more important than the testimony they will hear in court; the jury would be exposed to other patients whose "many and varied traumatic injuries *** could horrify or disgust members of the jury"; hospital nurses and doctors might "convey personal opinions to the jury and subvert the objective decision making process"; the trial court would not be able to control "the unknown and unpredictable circumstances that could prejudice the defendant"; and the jury would be given the impression that McTizic's condition was due only to the initial injury and not to the "many intervening circumstances that caused injury" to him. Defendant also argued that McTizic's testimony was not crucial to the State's case because McTizic never made an identification of defendant; taking McTizic's physician's testimony in the hospital would prejudice defendant; and defendant would further be prejudiced because the jury would see defendant in the custody of the sheriff. Defendant contended that there were alternative methods of taking McTizic's testimony, "such as videotape testimony, deposition testimony, or stipulated testimony," which defendant offered to do. The trial court denied defendant's motion.

At trial, Rush testified that he became a member of the Gangster Disciples street gang when he was 16 years old, remained a member for about five years and was no longer a member by the summer of

1994. McTizic and Deandre Bishop were Rush's friends, and McTizic and Deandre were brothers. On the evening of July 27, 1994, while it was still light out, Rush and Deandre drove in Rush's car to 7751 South Phillips in Chicago to pick up McTizic where McTizic lived with his girlfriend. Rush had never been in the area before. When they arrived, Rush waited in the car, which was double-parked with the windows rolled up and the motor running, while Deandre went inside to get McTizic.

Rush further stated that, after Deandre went inside, two men approached Rush's car from each side. The man standing on the driver's side of the car, who had his hands under his sweatshirt, was defendant. Rush had known defendant for a period of about three or four years before this incident because defendant's father had lived in the same neighborhood as Rush when Rush was about 13 years old, but Rush had not seen defendant since Rush joined the Gangster Disciples. Rush "raised the window down" on the car's passenger side, and the man asked Rush, "Is you a psyche," meaning are you "Folks" or Gangster Disciples, and Rush told the man, "I ain't nothing." The man then told Rush to "pull over," and Rush said, "I will pull over to show you that I ain't nothing." The man near Rush's passenger window also told defendant, "Don't shoot him yet." Rush then pulled the car over near the corner of Phillips Street.

Thereafter, Rush saw Deandre and McTizic in his side mirror coming out of the apartment building, and when 7 to 10 boys came "from everywhere" and jumped on Deandre, Deandre fell and then ran, and then jumped on the trunk of Rush's car. McTizic was "a couple seconds behind" Deandre. Between 7 and 10 people started hitting McTizic on the head "with bottles and stuff." Rush then saw defendant shoot at his car, the window shattered and he ducked; Rush then grabbed the steering wheel and the left side of his face and thought he was shot; Rush turned the corner on 78th and Phillips, at which time Deandre jumped on the back of the car; Rush drove slowly so that McTizic could catch up, but McTizic only made it to the door handle of the car and fell in the street on the side of Rush's car by the back wheel.

Rush further testified that he had seen defendant stand over McTizic and shoot downward at him; McTizic was lying on the ground "balled up"; and Rush did not see anyone else on the scene with a gun, except defendant. At that time, Rush "just took off" and drove west on 78th Street to the corner of the next block, where his car hit a van. Deandre then "flew off of the car and went into the tree." Both Rush's car and the van were "totaled." Rush had "messed up" his

legs, but climbed out of the car, started running down Yates, ran as far as he could, and then fell down and played dead.

Rush also stated that he spoke to some police officers on the scene but did not give a description of defendant or defendant's name. An ambulance took Rush to Cook County Hospital; Rush's jaw was cut open and he had glass in his face. Rush spoke to Officers Boylan and McDermott in the emergency room but did not tell them defendant's name. Rush was released from the hospital the next day, the police came to his home and asked him if he could identify defendant, he subsequently told the police that defendant had been wearing green pants and a "red little stripe on the shirt," and he viewed a lineup at police headquarters and identified defendant. Rush further testified that he had to wear a patch on his face for a month after the shooting incident and, at the time of trial, he still had glass in his left cheek.

The trial court subsequently transported the jury and defendant to a conference room at Cook County Hospital to hear McTizic's testimony. McTizic testified that on July 27, 1994, he was living at 7751 South Phillips with his girlfriend, Allena Taylor, and her mother. At about 8 p.m., Deandre and Rush came to pick him up. When McTizic and Deandre left McTizic's apartment building, there were about 15 people around Rush's car, McTizic and Deandre "rushed to the car" and, when McTizic got to the car, someone yelled, "Capri killer." As McTizic tried to open the door of the car, Rush pulled away and McTizic was dragged about three feet by the car and then fell. Deandre was able to jump on top of the car as Rush pulled away. McTizic got up, tried to run and heard gunshots going off. He covered his head and the last gunshot hit him in the ear and he fell. While he was lying on the ground, people began gathering around him. An ambulance arrived and took him to Cook County Hospital, where it was determined that he had been shot two times in the abdomen, once in the left shoulder, once in his left ear and once in his right elbow. McTizic further stated that he had been under continuous medical care since that day, he could walk but not like he used to, and he could no longer eat normally. McTizic also stated that he was not in a gang on the day of the shooting incident but had been in the Gangster Disciples before.

Dr. John Barrett, a trauma surgeon and the director of the trauma center at Cook County Hospital, testified that he was McTizic's physician and that McTizic was brought to the hospital on July 27, 1994, with multiple gunshot wounds to his head, his right shoulder and his abdominal cavity. The bullet wounds to McTizic's abdominal cavity were life-threatening injuries because they perforated McTizic's intestines and he would have died if an operation had not been

performed on him. Dr. Barrett further stated that McTizic's gall bladder was removed and his small intestine had to be shortened from 25 feet to 3 feet; the surgeons attempted to repair McTizic's duodendum, but failed; McTizic had 8 to 10 operations and had been under continuous medical care; McTizic was still in the intensive care unit because of his need for constant intensive care; and the complications experienced by McTizic were directly related to his gunshot wounds.

Thereafter, the jury returned to the courtroom. Allena Taylor then testified that, after McTizic and Deandre left her apartment on the day of the shooting, she heard gunshots and went outside and saw McTizic lying on the ground "balled up."

John Stella, a forensic investigator for the Chicago police department's crime lab, testified that he collected three cartridge cases from the crime scene. No fingerprints were lifted from the cartridge cases because the intense heat from firing would have dissipated the fingerprints, if any.

Officer Robert Furlong testified that he investigated the accident between Rush's car and the van. The van was "smashed up" and the car had "extensive damage." Furlong found Rush and Deandre lying on the grass alongside the car. Rush's face was bleeding and was "faint." Rush told Furlong that the shooter was wearing a green shirt with a red-orange emblem on it and green pants.

Furlong further testified that he spoke to Deandre, who "was very upset almost to the point of going into shock" and was crying, trembling and shaking. At that time, Deandre told Furlong that his name was Emmett Carter. Officer Furlong and two other police officers, Otten and Coleman, toured the area for five or six blocks around 78th and Yates in an unmarked squad car with Deandre. On the corner of 78th and Phillips, there was a large group of 15 to 20 people, including 7 or 8 young black males. Deandre told them to stop and back up and then identified defendant, who was standing in the group. Defendant was on a "little bike" at the time. Officer Furlong walked through the crowd, trying "to make it look like *** [he] wasn't going for anybody in particular," and went up to defendant and identified himself as a police officer. Furlong searched defendant and did not find anything on him. Furlong then handcuffed defendant and told him why he was being arrested. Furlong further stated that Deandre identified defendant as the shooter.

Detective James Boylan testified that the Black Stones street gang frequented the area of "73rd Street to 83rd Street, from Yates east to approximately Colfax." The Gangster Disciples frequented the area of "73rd Street to 83rd Street, from Colfax east to the lake." The area of

78th and Phillips was Black Stones territory. The "People" were gangs aligned with the Vice Lord street gang and the "Folks" were gangs aligned with the Gangster Disciples. The Black Stones were aligned with the People. During the summer of 1994, the Gangster Disciples were at war with the Black Stones. Defendant had told Boylan that he was affiliated with the Black Stones on June 9, 1994. Boylan subsequently went to the hospital and interviewed Allena Taylor and Rush in the emergency room. Rush told Boylan that Deandre jumped on the hood of the car and yelled for Rush to drive off. Rush also told Boylan that he turned westbound on 78th Street, heard a volley of gunfire, saw several black men with guns in their hands, and one of the men with a gun who approached his car "was medium complected [sic] about 19 to 20 years old wearing a green fuzzy hat with the brim turned up, red shirt and blue jeans." Boylan later interviewed Deandre. The next day, Boylan conducted a lineup, which included defendant. Rush viewed the lineup and identified defendant within seconds.

Deandre testified that he was McTizic's brother and that Rush was his friend. Deandre physically indicated how he had looked behind him after jumping on Rush's car and had seen defendant's face and saw defendant shoot McTizic five times while McTizic was "[b]alled on the floor covering his head." Deandre was a car length away when he saw McTizic being shot. Deandre also testified that defendant was the only person with a gun. After the police arrived, Deandre told the police what had happened and told them his name was Emmett Carter because he was too scared to give his real name. The police placed Deandre in their car and handcuffed him for about five minutes, then took the handcuffs off. Deandre rode with the police officers to the corner of 78th and Phillips, Deandre then told the police to back up after driving past a group of people and identified defendant in the group to the police. The police then "grabbed" defendant and asked Deandre if he was certain of his identification and Deandre said he was sure that defendant was the one who shot McTizic.

The State rested, and defendant called Officer Marvin Otten as a witness. Otten testified that he spoke to Deandre at 78th and Yates. Deandre gave a description of the shooter as a male black wearing green pants and a green shirt with orange or red writing. Otten also corroborated Furlong's testimony.

Defendant then rested. The jury subsequently found defendant guilty of the attempted first degree murder of McTizic and Rush, aggravated battery with a firearm of McTizic and Rush, and armed violence against McTizic.

At his sentencing hearing, defendant moved for a new trial, argu-

ing, among other issues not raised in this appeal, that he was prejudiced as a result of the jury's visit to the hospital to hear McTizic's and Dr. Barrett's testimony. The trial court denied defendant's motion, stating, in pertinent part:

> "[T]his Court recognizes that the Illinois Constitution and Illinois law allows that a person who is a victim of a crime I believe has a right to testify surrounding the circumstances of the events which caused the injury.
>
> *** I believe that under People versus Speck, the Prosecution does not have to accept an offer by the Defense to stipulate to certain testimony. The Prosecution had a right to proceed to trial in the manner in which they wish to put on their case.
>
>                  * * *
>
> In order for the Prosecution to prove their case beyond a reasonable doubt at least as to the armed violence, they had to show not only was the Defendant Mr. Willis armed with a dangerous weapon, that being a handgun, but that he also intentionally and knowingly without legal justification caused great bodily harm to Demetrios [*sic*] McTizic. There was information brought to the Court that Mr. McTizic could not be brought into this facility for purposes of testifying based upon his health. There was a request that the jury be brought to the hospital.
>
> This Court believes that Mr. McTizic had a right to testify, and that because of one of the issues was whether there was great bodily harm that the finder of fact, that being the jury, had a right to assess not only his testimony but also the testimony regarding his care.
>
> This Court does not see why a witness cannot be an accommodated, that being Dr. Barrett. We were at the hospital. To me it doesn't make any sense that Dr. Barrett, who was the head trauma surgeon at Cook County Hospital, could not be accommodated also. This Court does not believe that we should make it inconvenient for witnesses to testify. ***
>
> In this particular instance this Court felt it had a duty to allow Mr. McTizic to tell what he could regarding the events of July 27, 1994. While he could not identify Mr. Willis, he still could testify about what happened to him and what happened to him since. And the Prosecution I believe had a right to call Mr. McTizic to establish if they could before the finder of fact the great bodily harm to Mr. McTizic.
>
> *** And through no fault of Mr. McTizic, he is in a condition at the hospital. There is nothing he can do about the fact that he is constantly being treated and basically being sustained in a sense by machines.

* * *

I do not find that I should be controlled by a Defense offer to take a deposition or to proceed by way of stipulation. I believe that this Court took steps to ensure that the jury was not prejudiced by the fact that they went to the hospital facility.

* * *

The jury was brought to a room in a secluded spot in the hospital. No other personnel, no other injured individuals were brought into the courtroom besides the attorneys involved. The press was allowed to attend the proceeding because this is an open society, but this Court took specific steps to ensure that the jury could only concentrate on the evidence that was presented at the hospital through Mr. McTizic and Dr. Barrett.

* * *

And likewise, this Court again does not feel the fact that Dr. Barrett was accommodated, he is the chief trauma surgeon, and this Court believes that judges have a duty to do the best they can when it comes to witnesses. And since we were at the hospital, this Court does not find the fact that Dr. Barrett was not required to testify in the courtroom, since he was there, this Court feels that under those circumstances it was best to let him testify there to accommodate his schedule."

The trial court then heard arguments in aggravation and mitigation. The State requested that defendant be sentenced to an extended term because of the extremely brutal nature of the crimes and argued that no facts in mitigation existed while several factors in aggravation did. Defendant called witnesses in mitigation and his counsel argued that there were factors in mitigation, particularly hardship to defendant's family, his nonviolent nature as perceived by his family, and his rehabilitative potential. Defendant made a statement that he "condone[d] the jury's feelings" regarding "the bodily harm done to the guy *** in the hospital," but that he did not commit the crimes and he wished there was some way for him to prove to the court that he did not commit the crimes. Thereafter, the trial court, in sentencing defendant, stated:

"In assessing the appropriate sentence, the Court takes into consideration the facts of this case, the information the statements of respective counsel and the statements of Mr. Willis.

With respect to mitigation, this Court agrees with Mr. Mayfield [defendant's attorney], that there are factors in mitigation which exist on behalf of Mr. Willis. This Court takes into consideration that Mr. Willis is 22 years of age.

This Court takes in consideration the potential for rehabilitation

that Mr. Willis possesses. \*\*\* I believe he can be rehabilitated once he serves his sentence. \*\*\* He does have a family, a family that loves him, obviously. And I am sure he loves his family. And I am sure that his three children and his wife or his girlfriend [*sic*] love him also. He has probably been a good father to them.

I take into consideration that Mr. Willis has previously been shot. In 1988 he was shot in the stomach. And he also was shot in the lower leg in 1994.

I believe that imprisonment here will cause hardship to his dependents. \*\*\*

\* \* \*

With respect to aggravation, the Court recalls vividly the testimony. As far as the Court is concerned, the heroic testimony of Mr. Rush and \*\*\* [Deandre]. They came in here and described vividly the events of July 27th, a situation where three young men out to enjoy themselves, not affiliated with any gang, went to a location. Two people went to a location to pick up Demetrios [*sic*].

The Court recalls the testimony that it was the Defendant who had Mr. Rush pull his car over because the Defendant was checking on what type of gang Mr. Rush was in, and Rush was trying to show the Defendant that he was not in a gang.

The Court recalls the vivid testimony about how an unwarranted attack occurred on Demetrios [*sic*] McTizic by at least seven individuals who started beating him. And the Court recalls the vivid testimony about how Mr. Willis, the Defendant, stood over Demetrios [*sic*] McTizic and fired his weapon as McTizic was in a fetal position on the sidewalk, an unwarranted attack on Mr. McTizic.

The Court also vividly recalls the fact that Tyrone Rush in attempting to get away, that \*\*\* [Deandre] was on the car as the car drove off, and the Defendant had fired at Rush, that the bullet had entered into the vehicle, and Mr. Rush received a wound from flying glass, and that eventually they did crash and luckily Mr. Rush and [Deandre] were not further injured when attempting to get away.

The Court finds that those facts are aggravating. The Court finds with respect to other factors in aggravation, the Court finds that statutorily the Defendant's conduct did cause serious harm to McTizic and threatened serious harm to Mr. Rush.

The Defendant does have a prior history of criminal activity, a conviction for possession of a controlled substance and delivery of a controlled substance. It is a criminal history, but the Court will say it is not a significant criminal history.

With respect to Point 7, this Court finds that the sentence here is

necessary to deter others from committing the same crime. The Court finds that at the time of this occurrence the Defendant was serving a period of probation, having been given probation on January 13, 1992.

The Court finds that another factor in aggravation is that this offense was committed while he was participating I believe in gang related activity, checking on the status of Mr. Rush and then joining in with fellow gang members and then being the main instigator in that shooting of Mr. McTizic and shooting at Mr. Rush.

With respect to an extended term, the Court finds that Point 2 is applicable, when a Defendant is convicted of any felony and the Court finds the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty, this Court finds that when Mr. Willis stood over an unarmed, defenseless Demetrios [*sic*] McTizic and fired down at him, that based upon the number of shots and the manner in which Mr. McTizic was nearly executed, I find that Mr. Willis' actions were exceptionally brutal and heinous and indicative of wanton cruelty.

It is hard to conceive that Mr. Willis, who in fact has been a victim of a gunshot wound, would not know the pain and would not know the terror that one would receive when being shot.

Yet, this Court finds that he had no hesitation in inflicting serious wounds upon Mr. McTizic. The evidence is overwhelming that there was great bodily harm to Mr. McTizic as evidenced by the testimony of both Mr. McTizic and Dr. Barrett."

The trial court sentenced defendant to 40 years' imprisonment for the attempted first degree murder of McTizic and 10 years for the attempted first degree murder of Rush, the sentences to run consecutively. The trial court found that the aggravated battery with a firearm counts merged into the attempted murder counts. The trial court also sentenced defendant to 30 years' imprisonment for armed violence, to run concurrently with defendant's 40-year sentence for the attempted murder of McTizic. This appeal followed.

Defendant first contends that the trial court erred in allowing the testimony of McTizic to be taken at Cook County Hospital. Defendant argues that the jury's hearing of McTizic's testimony at the hospital had very little probative value "but very high prejudicial value" and the jury was unduly influenced by the hospital setting, thereby depriving defendant of his right to a trial by an impartial jury. Defendant further contends that under Rule 804 of the Federal Rules of Evidence, McTizic was unavailable as a witness and the trial court abused its discretion in allowing McTizic to testify. Defendant also maintains that because Supreme Court Rule 414 (134 Ill. 2d R. 414) provides

that the court may order a witness to submit to an evidence deposition if it is possible that the witness would be unavailable for the trial, the trial court erred in ordering the jury to travel to the hospital to hear McTizic's testimony rather than using the alternative methods of taking McTizic's deposition or by affidavit or allowing defendant to stipulate to McTizic's testimony, which would have avoided "the undue prejudicial effect of the hospital visit."

The State argues that the trial court acted within its discretion in allowing the jury to travel to the hospital to hear McTizic's testimony because he was unable to leave the hospital. The State maintains that it was not required to accept defendant's offer of a stipulation, it had the right to prove every element of its case and McTizic provided testimony that defendant's actions caused him great bodily harm and evidence regarding the events surrounding the crimes. The State further contends that the trial court "took strict measures to ensure that the jury was not exposed to" unnecessary factors while at the hospital and that "defendant was protected by the careful manner of the proceedings."

■ It is well settled that "the prosecution is not disabled at trial from proving every element of the charged offense and every relevant fact, even though the defendant fails to contest an issue or is willing to stipulate to a fact." *People v. Bounds*, 171 Ill. 2d 1, 46, 662 N.E.2d 1168 (1995). For example, in *People v. Speck*, 41 Ill. 2d 177, 201, 242 N.E.2d 208 (1968), where the defendant had agreed to stipulate to the identity of the decedents involved and the cause of their deaths, the defendant maintained that it was prejudicial error by the trial court to allow the admission of photographs of the bodies of the deceased women because they lacked any probative value and were so shocking in nature that they would inflame the passions of the jurors, and to allow the testimony of a pathologist and the victims' relatives. The *Speck* court, in rejecting the defendant's argument as to the admission of the photographs and testimony of the pathologist, held that the State "had the right [under the defendant's plea of not guilty] to prove every element of the crime charged and was not obligated to rely on the defendant's stipulation." *Speck*, 41 Ill. 2d at 201. The *Speck* court further stated:

> " 'Evidence having a natural tendency to establish the facts in controversy should be admitted. A party cannot have competent evidence excluded merely because it might arouse feelings of horror and indignation in the jury. Any testimony concerning the details of a murder or other violent crime may have such tendencies, but manifestly this could not suffice to render it incompetent. ***

[Q]uestions relating to the character of the evidence offered, and the manner and extent of its presentation, are largely within the discretion of the trial judge, and the exercise of that discretion will not be interfered with unless there has been an abuse to the prejudice of the defendant.' " *Speck*, 41 Ill. 2d at 202-03, quoting *People v. Jenko*, 410 Ill. 478, 482, 102 N.E.2d 783 (1951).

"A court, in its discretion, may permit a jury to view evidence outside of the courtroom." *People v. Loggins*, 257 Ill. App. 3d 475, 481, 629 N.E.2d 137 (1993).

■ In the present case, we find that the trial court did not abuse its discretion in allowing the jury to hear McTizic's testimony at the hospital. While hearing McTizic's testimony in the hospital setting may have been upsetting to some jurors, the State had the right to present evidence of every element of the crimes charged against defendant, which included McTizic's testimony regarding the severity of his bodily injuries and his memory of the incident in which he was injured, notwithstanding that alternative methods for obtaining McTizic's testimony, as argued by defendant, existed. The State was entitled to prove this element and we believe that the probative value of this testimony outweighed any prejudicial effect. Moreover, we fail to see how viewing McTizic at the hospital would be any different than viewing him in a courtroom in light of the fact that his medical condition would have required him to be accompanied by medical personnel and machines in the courtroom, as he was at the hospital.

We briefly note that the cases and evidentiary rules relied upon by defendant are completely inapplicable to the issue at bar. Defendant cites to Rule 804 of the Federal Rules of Evidence (Fed. R. Evid. 804), which contains a definition of what constitutes the unavailability of a witness. Defendant provides no authority supporting why federal rules of evidence are applicable in a state criminal proceeding. Moreover, Rule 804 does not limit a state trial court's discretion in allowing a jury to hear the testimony of a witness at a hospital and, in fact, the clear purpose of Rule 804 is to establish when statements by an unavailable declarant are admissible as an exception to the hearsay rule. Similarly, nothing in Supreme Court Rule 414 (134 Ill. 2d R. 414), which provides that a trial court *may* order an evidence deposition of an unavailable witness, specifies any prohibition of where a deposition may be taken, and defendant fails to cite to any authority in support of his argument otherwise.

Defendant also relies on *McDonald v. Pless*, 238 U.S. 264, 59 L. Ed. 1300, 35 S. Ct. 783 (1915), *People v. Preston*, 76 Ill. 2d 274, 391 N.E.2d 359 (1979), and *People v. Nuccio*, 54 Ill. 2d 39, 294 N.E.2d 276

(1973), for the proposition that "when a jury is unduly influenced by events external to the jury members themselves, such as the hospital setting in this case," his "6th amendment right to trial by [an] impartial jury is compromised." However, these cases are distinguishable from the present case; none of them involved the propriety of transporting a jury to a hospital to hear the testimony of a crime victim. *McDonald*, 238 U.S. at 269, 59 L. Ed. at 1302, 35 S. Ct. at 785 (the Court held that the losing party in a case cannot use the testimony of jurors to impeach their verdict in order to have a new trial); *Preston*, 76 Ill. 2d at 278 (the court considered the propriety of a supplemental instruction given to the jury, the "alleged failure of the trial court to explore fully a response made by a juror during the polling of the jury," and the trial court's refusal to admit a posttrial deposition of a juror); *Nuccio*, 54 Ill. 2d at 40-41 (the court considered the defendant's claims that the trial court erred in allowing the prosecution 13 peremptory challenges and failed to question jurors regarding an allegation of jury contamination, he was deprived of a fair trial by prejudicial comments made by the prosecutor in closing argument, the prosecution knowingly offered false and prejudicial testimony, and the evidence was insufficient to prove him guilty of murder).

■ Defendant also contends that the trial court erred in allowing Dr. Barrett to testify at the hospital, "thereby buttressing the victim's testimony and increasing the prejudicial effect." Defendant argues that the trial court's wish to make testifying convenient and accommodating to Dr. Barrett "trampled on the constitutional right of the [defendant] to a fair and impartial trial." Defendant asserts that convenience and accommodation are not "enveloped in the definition of availability" within "the Federal Rules of Evidence, Supreme Court Rules or case law." Defendant argues that Dr. Barrett's testimony dealt exclusively with McTizic's injuries and "had no probative effect as it related to" defendant.

The State argues that the trial court properly acted within its discretion and that "it was natural and proper for the trial court to accommodate Dr. Barrett and allow him to testify" at the hospital. The State maintains that Dr. Barrett's testimony was important to demonstrate the grave bodily harm experienced by McTizic. The State also argues that because Dr. Barrett's testimony would have been the same in the hospital or the courtroom, defendant was not prejudiced by the jury hearing his testimony at the hospital.

The trial court has the discretion to allow the jury to hear testimony outside of the courtroom. *Loggins*, 257 Ill. App. 3d at 481. From the facts presented here, especially considering the fact that the

jury was already in the hospital to hear McTizic's testimony, we find that the trial court did not abuse its discretion in allowing Dr. Barrett to testify in the conference room at the hospital. Dr. Barrett's testimony supported an element of proof of the State's case against defendant, *i.e.*, that McTizic suffered great bodily harm, and even though Barrett's testimony may have been "difficult" for the jury to hear because of the nature of McTizic's bodily injuries, " '[a] party cannot have competent evidence excluded merely because it might arouse feelings of horror and indignation in the jury.' " *Speck*, 41 Ill. 2d at 202, quoting *Jenko*, 410 Ill. at 482. Moreover, we find no undue influence flowing from the taking of Dr. Barrett's testimony at the hospital because the jury had already heard McTizic's testimony in the hospital surroundings and any alleged undue influence would have been present as a result of hearing McTizic's testimony there, as discussed above.

We briefly note that defendant again relies on Rule 804 of the Federal Rules of Evidence and Supreme Court Rule 414 in arguing that the convenience and accommodation of Dr. Barrett are not "enveloped in the definition of availability." Defendant's argument is meritless because, not only in light of our discussion above regarding the inapplicability of Rule 804, Dr. Barrett was not an "unavailable" witness, Rule 414 is inapplicable since Barrett was not an unavailable witness, and the trial court's decision to accommodate Dr. Barrett was within the trial court's discretion. Defendant's reliance on *McDonald*, *Preston* and *Nuccio* is also misplaced for the same reasons stated above regarding McTizic's testimony.

Defendant next contends that the jury erred in finding him guilty beyond a reasonable doubt of the crimes charged and that, absent the prejudice imposed upon defendant by the trial court in allowing the jury to hear McTizic's and Dr. Barrett's testimony at the hospital, the jury would not have found him guilty. Defendant argues that Rush was not a credible witness based on Rush's "multiple convictions, pending cases, gang membership, and little if any opportunity to observe" the shooter. Defendant also asserts that Rush was not credible because, after being driven around by the police to look for the shooter immediately after the shooting, Rush failed to tell the police that he knew defendant was the shooter.[2] Defendant further argues that because McTizic did not identify defendant "as being the shooter

---

[2]Defendant has confused Rush's and Deandre's testimony; Deandre, not Rush, accompanied the police and identified defendant in a group of people while driving through the neighborhood.

or even being present as one of the 15 gang members who attacked him," Rush's testimony identifying him was uncorroborated. Accordingly, defendant maintains that the testimony of McTizic and Rush was not enough to prove him guilty beyond a reasonable doubt. Defendant does not make any argument regarding Deandre's testimony. Defendant lastly argues that "[t]here was no testimony offered linking [him] to the injuries suffered by Mr. Rush and no basis for an accountability or transferred intent theory as well as no jury instructions in that regard."

The State contends that the jury properly found defendant guilty beyond a reasonable doubt, arguing that considering the evidence presented in the light most favorable to the State, "there is no reasonable doubt of defendant's guilt" and that the jury was free to accept the witnesses' testimony and that the jury believed that Rush and Deandre properly identified defendant.

■ "The standard to be applied in considering the sufficiency of the evidence is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Bounds*, 171 Ill. 2d at 46, quoting *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985). The credibility of witnesses is within the sole province of the trier of fact. *People v. Steidl*, 142 Ill. 2d 204, 226, 568 N.E.2d 837 (1991).

■ Here, the State's evidence against defendant was substantial. The State presented the identification testimony of Rush and Deandre regarding the shooting incident. Deandre testified that defendant was the only person he saw with a gun, Rush and Deandre saw defendant stand over McTizic and shoot him, both Rush and Deandre testified that defendant attempted to shoot Rush, and police officers witnessed Rush's and Deandre's identification of defendant after the crimes. The State also presented unrefuted testimony showing that defendant was a member of the Black Stones gang and the gang was involved in a "war" with the Gangster Disciples at the time of the incident in question. After viewing the evidence in the light most favorable to the prosecution, we find that it is clear that a rational trier of fact could have found the essential elements of the crimes with which defendant was charged beyond a reasonable doubt.

■ Briefly, we note that defendant's argument, that the jury's verdict would have been different if the jury had not heard McTizic's and Dr. Barrett's testimony at the hospital, is unconvincing. As discussed above, the trial court did not abuse its discretion in allowing the jury to hear testimony at the hospital and, moreover, even absent

the testimony of McTizic and Dr. Barrett, the State presented overwhelming evidence of defendant's guilt from which a rational trier of fact could have found that defendant committed the crimes for which he was charged. Therefore, we conclude that the jury's verdict would not have been different.

Defendant also contends that the trial court erred in sentencing him to consecutive sentences. Defendant argues that the trial court, prior to sentencing him to consecutive sentences, was required, but failed, to make specific findings of fact in the record that, "having regard to the nature and circumstances of the offense and the history and character of the defendant, it is the opinion [of the court] that such a term is required to protect the public from further criminal conduct by the defendant."

The State contends that defendant waived this issue by failing to file a written postsentencing motion within 30 days of the trial court's sentence. Alternatively, the State maintains that the sentence imposed by the trial court was not an abuse of discretion. The State argues that consecutive sentences are proper when a defendant has committed a Class X or Class 1 felony and has caused great bodily injury and, here, defendant was convicted of two counts of attempted murder, a Class X felony, and defendant caused great bodily harm. The State further argues that there is nothing in the sentencing statute that requires the trial court to recite specific language in imposing consecutive sentences.

Failure to raise a sentencing issue at the time of sentencing or in a motion to reconsider constitutes waiver for purposes of appeal. *People v. McCleary*, 278 Ill. App. 3d 498, 501, 663 N.E.2d 22 (1996). We find that defendant has waived these issues by failing to raise objections to his sentence at his sentencing hearing or in a postsentencing motion to reduce sentence.

Notwithstanding defendant's waiver, we also find his arguments without merit. It is well settled that "[t]he sentence imposed by a trial judge is entitled to great deference. [Citations.] Its ruling will not be disturbed absent an abuse of discretion. *** A sentencing judge is presumed to have considered all relevant factors absent a contrary showing in the record." *People v. Back*, 239 Ill. App. 3d 44, 80, 605 N.E.2d 689 (1992).

■ The Unified Code of Corrections states, in pertinent part:

"(a) *** The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant

was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, \*\*\* in which event the court *shall* enter sentences to run consecutively. \*\*\*

(b) The court shall not impose a consecutive sentence *except as provided for in subsection (a)* unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." (Emphasis added.) 730 ILCS 5/5—8—4(a), (b) (West 1996).

Attempted murder is a Class X felony for the purposes of consecutive sentencing. *People v. Perkins*, 274 Ill. App. 3d 834, 836, 655 N.E.2d 325 (1995). "Under section 5—8—4(a) of the Unified Code of Corrections \*\*\*, a circuit court *must* impose consecutive sentences where multiple offenses are part of a single course of conduct without a substantial change in the criminal objective, when (1) one of the convictions is a Class X or Class 1 felony and the defendant inflicted severe bodily injury, or (2) one of the convictions is for either aggravated criminal sexual assault or criminal sexual assault." (Emphasis in original.) *People v. Arna*, 263 Ill. App. 3d 578, 589, 635 N.E.2d 815 (1994).

■ We find that the trial court here did not err in imposing consecutive sentences and, in fact, the trial court would have erred if it had not imposed consecutive sentences. The evidence clearly showed that defendant committed the attempted murder, a Class X felony, of both Rush and McTizic in a single course of conduct without a substantial change in his criminal objective and caused severe bodily injury to McTizic. Accordingly, section 5—8—4(a) of the Code *required* the trial court to impose consecutive sentences.

■ We briefly address defendant's argument that section 5—8—4(b) required the trial court to make specific findings that the consecutive terms were necessary to protect the public, and we find it unpersuasive. The statute provides that "[t]he court shall not impose a consecutive sentence except as provided for in subsection (a)." 730 ILCS 5/5—8—4(b) (West 1996). Therefore, section 5—8—4(b), rather than imposing additional requirements on the trial court imposing consecutive sentences under section 5—8—4(a), merely requires the trial court to make these findings in the event it imposes a consecutive sentence absent the conditions set out in section 5—8—4(a).

■ Lastly, defendant contends that the trial court abused its discretion in sentencing him to an extended term. Defendant argues that the trial court failed to take into account mitigating evidence and that the trial court abused its discretion in finding defendant's conduct

to be exceptionally brutal or heinous. Defendant asserts that the trial court's description of defendant's conduct that he "stood over and fired down at the victim" was not supported by the record. Defendant maintains that even if the evidence is considered in the light most favorable to the State, the "shooter's" conduct was not "exceptionally brutal, heinous or wantonly cruel or even out-of-the-ordinary."

The State contends that an extended sentence was appropriate because defendant's conduct was exceptionally brutal or heinous. The State argues that the trial court expressed its intent to protect the public from defendant at sentencing. The State maintains that the trial court properly sentenced defendant and explained its reasoning while doing so. The State further argues that the mitigating factors presented by defendant "did not stand much chance of tipping the balance greatly in his favor" in comparison with the brutal nature of his crimes. The State also argues that the trial court did take into account the mitigating factors in sentencing defendant. The State further argues that the record shows that the trial court's description of defendant's shooting of McTizic was correct.

As this court stated in *People v. Champs*, 273 Ill. App. 3d 502, 652 N.E.2d 1184 (1995):

> "An extended-term sentence may be imposed if the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. *** Behavior is exceptionally brutal and heinous where the shooting is systematic, unprovoked, continues after the victim has been struck, and lacks any logical reason. [Citation.] Cruelty is a disposition to inflict pain or suffering. [Citation.] A single act that causes death or injury may be sufficient to demonstrate exceptionally brutal or heinous behavior." *Champs*, 273 Ill. App. 3d at 510.

We find that the trial court did not abuse its discretion in sentencing defendant to an extended term. The trial court made specific findings that defendant's actions "were exceptionally brutal and heinous and indicative of wanton cruelty." The fact that defendant has a different opinion of the severity of his actions does not show that the trial court abused its discretion.

We also reject defendant's argument that the trial court's characterization of the evidence of defendant's actions was incorrect based on the court's statement that defendant "stood over an unarmed, defenseless Demetrios [*sic*] McTizic and fired down at him." Contrary to defendant's argument, there was ample evidence in the record, based on Rush's and Deandre's testimony, that McTizic was lying on the pavement while defendant stood over him and shot him

several times. We therefore hold that the trial court did not abuse its discretion in sentencing defendant.

For the reasons stated, we affirm the judgment of the circuit court.

Affirmed.

CAHILL, P.J., and LEAVITT, J., concur.