THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRION DANIELS, Defendant-Appellant.

First District (6th Division)    No. 1—99—3051

Opinion filed May 17, 2002.

Andre M. Grant, of Law Office of Andre M. Grant, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Annette Collins, and Dawn Kibbon, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE GALLAGHER delivered the opinion of the court:

After a jury trial, defendant, Brion Daniels, was convicted of two counts of aggravated criminal sexual assault and sentenced to a concurrent term of 22 years' imprisonment. On appeal, defendant contends: (1) one of his convictions for aggravated criminal sexual assault must be reversed as in violation of the one-act, one-crime rule because both convictions were based on the same physical act, (2) his conviction for aggravated criminal sexual assault based upon the display of a dangerous weapon must be vacated because the State failed to prove the presence of a dangerous weapon during the course of the sexual assault, (3) he was denied a fair trial where the State improperly elicited prior consistent statements of the victim, (4) the State improperly elicited irrelevant evidence which served only to prejudice the jury against defendant, and (5) his counsel was ineffective for failing to request an instruction for the lesser-included offense of aggravated battery. We affirm in part and vacate in part.

The following evidence was adduced at trial. The victim in this case testified that, in March of 1998, she and her boyfriend, Robert Garland, lived near her sister, Tawana Pouncey, who lived at 7241 S. Evans in Chicago. The victim had known defendant for about one year because he lived next door to Tawana and would sometimes visit.

On March 12, 1998, the victim woke up around 2 p.m. because she had been drinking and smoking crack the night before. Around 3:30 p.m., her 11-year-old niece, Monica Pouncey, came over to visit her. Later that evening, between 7:30 and 8 p.m., the victim walked Monica back to her house at 7241 S. Evans. They walked inside and saw Tawana's boyfriend, Gerald Nalls, and defendant sitting in the front room. The victim walked into the front room and sat on the couch. Monica went into the kitchen.

After the victim sat down, defendant accused her of giving a man oral sex in the alley. The victim denied it, but defendant continued to accuse her of giving oral sex to a man in the alley. The victim told de-

fendant that it was "none of his business" because "he wasn't [her] man."

The victim testified that after their argument "something popped [her] in the head." Defendant had hit her in the head with the butt of a gun. Feeling dizzy, the victim started to stand up. Defendant told her to sit back down because "[he] was going to kill [her]." She sat back down on the couch, but then got up to go into the bathroom. In the bathroom, she saw a "big knot upside [her] head." Defendant came into the bathroom and closed and locked the door. He then hit her in the head numerous times and she fell to the floor. Defendant continued to hit and kick her. The victim urinated and had a bowel movement on herself.

Defendant told her to get up off the floor and told her to "suck his dick." The victim had her eyes closed but felt defendant put his penis in her mouth and ejaculate. Defendant then walked out of the bathroom and the victim spat defendant's ejaculate in the toilet. She then walked out of the bathroom and saw the police. She told the police that defendant ran out the back door. The victim was transported by ambulance to Northwestern Memorial Hospital.

At the hospital, photographs were taken of the victim. She testified that she had a knot over her left eyebrow, bruises and a black eye. The victim denied ever dating defendant, having sexual relations with defendant or taking money from him for sex.

Dr. Geno Tellez, a surgeon at Northwestern Memorial Hospital, testified that he examined and treated the victim on March 12 and 13 of 1998. When he first examined her, she was complaining of facial pain, head pain, abdominal pain, and lower back pain. She told the doctor that she had been beaten and "pistol whipped." Dr. Tellez noticed that she had soiled her clothes and evaluated her to check for serious injuries. Several X rays, including CAT scans, were performed to evaluate her injuries.

Dr. Tellez testified on direct examination that the X rays revealed that there was a tear in her spleen; however, during cross-examination he stated that there was a "possibility" that the victim had a torn spleen. He also testified that the victim had fractured ribs. There was no need to operate because she had no signs of internal bleeding. He further testified that spleen and rib injuries were consistent with kicking or punching to the body.

After examining the victim's rib area, he examined her face and head and stated that her face was "extremely swollen" and there were abrasions, lacerations, blood and swelling around her eyes. She had fractures to her nasal bones and suffered a fracture to her lower lumbar vertebrae, which was consistent with a "violent punch or

kick." Additionally, Dr. Tellez testified that the divot mark on the victim's forehead and her facial injuries were consistent with a "blow from a hard metal object like the butt of a handgun."

The victim's niece, Monica Pouncey, testified that on March 12, 1998, she was in the kitchen and saw defendant "clunk" her aunt "upside [her] head." Monica testified that defendant hit her aunt with the bottom part of his gun. Monica saw her aunt run into the bathroom. Monica then saw defendant follow her aunt into the bathroom and close the door. Monica heard her aunt screaming. Because there was no telephone at Monica's house, she left the house to go call the police. Monica ran back to her aunt's house, but never called the police.

Chicago police officer Word testified that on the evening of March 12, 1998, he and his partner were writing a parking ticket when Robert Garland came up to him and told them of a battery at 7241 S. Evans. When Officer Word arrived, he saw defendant stick his head out of the front door and immediately close it. Officer Word entered the house and saw the victim, who shouted, "he is trying to kill me." The victim pointed to the back door and Officer Word walked out the back and saw defendant standing in the yard holding a handgun. Defendant tossed his gun to the ground and ran towards the front of the house. Defendant was arrested and his gun was recovered. Officer Word further testified that he remembered handcuffing defendant and defendant was not wearing any jewelry on his hands. Officer Word went back into the house, and the victim told him that defendant had hit her face with his gun and that he forced her to perform oral sex. Officer Word observed that the victim's face was very swollen, she had lots of contusions and bruises all over her face, and she was slumped over because she said her stomach "was hurting her real bad." The left side of her face was swollen shut, and she had blood all around her face.

Defendant testified that in March of 1998, he lived with his mother and father next door to Tawana Pouncey. He testified that he had a neighborly relationship with the victim until December 24, 1997. He testified that on December 24, 1997, and on January 2, 1998, he paid the victim $20 for oral sex. He maintained that he had paid the victim money in exchange for sex on numerous occasions. Defendant stated that he and the victim stayed at the Skyway Motel on January 30 and 31 of 1998, and he paid her money for sex. She would leave the motel with defendant's money and return with cocaine. Defendant further testified that, while his parents were out of town, the victim would stay at his house and he would pay her money for intercourse and oral sex.

Defendant testified that, on March 10, 1998, the victim stayed at his house and watched videos. She left at 5:30 a.m. and he let her borrow two videos. When defendant got up at 10:30 a.m., he noticed that $35 and his gold chain were missing.

On March 12, 1998, defendant testified that Gerald Nalls had invited him over to his apartment. Later, the victim and her niece arrived. Defendant testified that the victim came in the front room and that he could smell alcohol on her. The victim told him "[y]ou don't know what I had been through." Defendant accused her of taking his chain and money and not returning the videos. The victim told him they would talk about it later and pulled out a crack pipe and some drugs. Defendant got angry and smacked the victim with the back of his right hand. He stated that he was wearing a ring on his right hand at the time. Defendant swung again, but the victim pushed his arm and he then hit the cocktail table and the victim in the face. The victim continued to smoke crack. Gerald Nalls told defendant his hand was bleeding, so defendant went into the bathroom.

Defendant next testified that the victim followed him into the bathroom and tried to hug him. He pushed her away from him and "smacked her in the face" with his right fist. Defendant testified that the victim told him she could get his videos and gold chain, but she needed some money to do it because she owed some drug dealers some money. He testified that he hit her again, but this time he did it with an open left hand; he smacked her across the side of her face. Defendant testified that the victim then closed the door and that she, while sitting on the toilet seat, pulled defendant toward her and unzipped his zipper. Defendant testified that the victim tried to perform oral sex on him, but he shoved her head back. He then left the bathroom and began looking for his jacket. He admitted that he carried a gun in his jacket, but stated that he did not hit the victim with a gun and did not take it out in front of her. He found his jacket and headed for the back door. He fumbled through his wallet to make sure he had everything. When he reached the back porch, he heard Gerald Nalls say "he's in there and he [sic] got a gun in his jacket." Defendant testified that he then put the wallet back in his jacket, threw the gun into his backyard, put his jacket on, crossed over to his yard, and walked to the front gate. The police arrested defendant, handcuffed him and patted him down. They took him to the police station. He was then taken to the hospital where his hand was bandaged.

Detective William Halloran testified that on March 12, 1998, he interviewed the victim and her niece, Monica. Monica told him that she saw defendant hit her aunt in the head twice with his fist and that she did not see a gun. She told him she saw her aunt run into the

bathroom and that defendant followed her in and closed and locked the door. Detective Halloran interviewed the victim at the hospital, and she told him that defendant had started asking her questions about her personal life and had accused her of being with someone named "Junior." When defendant did not like her answers, he had punched her in the face twice. The victim did not mention to the detective that defendant hit her with a gun while in the living room. However, she did tell him that defendant started to hit her with a handgun and kick her after he had followed her into the bathroom and locked the door. She also told the detective that defendant, who had a handgun in his hand, demanded that she "suck his dick." She told the detective that she had never been intimate with defendant before. She told him that she thought she may have passed out, but she remembered leaving the bathroom and seeing defendant look out the front door but then leave out the back door.

Defendant's father testified that he had seen the victim in his house on two occasions. He testified that he once saw her naked in his bathroom.

In rebuttal, Assistant State's Attorney (ASA) Chamberlain testified that she interviewed defendant on March 13, 1998. ASA Chamberlain prepared a handwritten statement and defendant read it, reviewed it, signed each page and initialed each correction. Defendant told her that he had only had sex with the victim one time and he "really couldn't recall it." He stated that he had started to have feelings for the victim and on March 12, 1998, he got into an argument with the victim over someone named "Junior." Defendant stated that before that date, the victim was at Tawana's house with Junior. Defendant became "hurt and upset" that the victim was with Junior, so he shot out Junior's windows. Defendant stated that the victim had told him that she wanted to be with him and that Robert Garland was not her boyfriend. Defendant further stated that, on March 12, 1998, he asked the victim if she had been with Junior and she answered "no." He became angry and asked her again and she finally answered "yes." He jumped up and hit her in the face twice. He told ASA Chamberlain that he followed the victim into the bathroom. He locked the door and continued to hit the victim and sprained his hand in the process. Defendant additionally stated that, while in the bathroom, the victim offered and gave him a "blow job." Defendant told ASA Chamberlain that he walked out of the bathroom and saw the police outside the front door, so he left out the back door. Defendant admitted to throwing his gun over a fence because he did not want to get caught with it. Defendant never informed ASA Chamberlain that he had an ongoing relationship with the victim or mentioned anything about missing money or a gold chain.

During his testimony, defendant admitted to meeting with ASA Chamberlain and admitted signing his six-page statement prepared by ASA Chamberlain, but denied ever reviewing it. Defendant denied almost his entire statement that ASA Chamberlain testified to. He testified that he informed ASA Chamberlain of all the sexual encounters that he had testified to. He stated that he told ASA Chamberlain about his missing gold chain and money. He admitted to ASA Chamberlain that he carried a gun for protection despite not having a permit for it.

■ Defendant first argues that one of his convictions for aggravated criminal sexual assault must be reversed as being in violation of the one-act, one-crime rule because both convictions were based on the same physical act. The State concedes that, under *People v. King*, 66 Ill. 2d 551, 363 N.E.2d 838 (1977), defendant cannot be convicted of two counts of aggravated criminal sexual assault where there was only one act of sexual penetration to one victim.

When multiple convictions of greater and lesser offenses are obtained for offenses arising from a single act, a sentence should be imposed on the most serious offense and the convictions on the less serious offenses should be vacated. *People v. Garcia*, 179 Ill. 2d 55, 71, 688 N.E.2d 57, 64 (1997). Where, as here, the two convictions are for the same class of offense, we look to whether one offense requires a more culpable mental state than the other. *People v. Calva*, 256 Ill. App. 3d 865, 870, 628 N.E.2d 856, 860 (1993). In *Garcia*, our supreme court stated that "when multiple convictions for aggravated criminal sexual assault are obtained from a single act of penetration, there is no way to determine the most serious conviction because none of the convictions involve either a more or less culpable mental state." *Garcia*, 179 Ill. 2d at 71, 688 N.E.2d at 64-65. Here, however, one of defendant's convictions was for aggravated criminal sexual assault based upon the display of a dangerous weapon and the other was for aggravated criminal sexual assault based on bodily harm to the victim. Thus, the present case is distinguishable from *Garcia*. We conclude that we should affirm defendant's conviction for aggravated criminal sexual assault based on bodily harm to the victim, which requires a more culpable mental state than aggravated criminal sexual assault based upon the display of a dangerous weapon. See *People v. Olsen*, 161 Ill. App. 3d 945, 950, 514 N.E.2d 233, 237 (1987) (concluding that, as between two convictions for aggravated criminal sexual assault predicated upon one act of sexual penetration, court would vacate conviction that had as its aggravating factor the display of a dangerous weapon, which was "somewhat less serious" than conviction based upon causing bodily harm to the victim); see also *People v. Gutierrez*,

156 Ill. App. 3d 555, 509 N.E.2d 787 (1987) (also retaining aggravated criminal sexual assault conviction based on bodily harm as opposed to conviction based upon age of defendant and age of victim, who was 12 years old). We therefore vacate defendant's conviction and sentence for aggravated criminal sexual assault based upon the display of a dangerous weapon. In view of this decision, we need not address the second issue raised by defendant as to whether the State proved beyond a reasonable doubt that defendant displayed a weapon during the course of the sexual assault.

■ Defendant's next contention is that he was denied a fair trial where the State improperly elicited, from Detective Halloran, prior consistent statements of the victim, even though there had been no allegations of recent fabrication or motive to testify falsely. Defendant contends that this testimony of Detective Halloran improperly bolstered the victim's testimony.

The defense called Detective Halloran in its case in chief to impeach the victim's testimony that defendant hit her with the butt of the gun in the living room. Detective Halloran testified that the victim never told him that defendant had hit her in the face with a pistol while in the living room, but had only told him that defendant had punched her. The State cross-examined Detective Halloran and elicited the following:

"Q. [The victim] did tell you that when she went in the bathroom she saw her face was bleeding?

A. Yes.

Q. She also told you that after she had made the statement that Brion Daniels came into the bathroom, closed the door and locked it, that she couldn't get out and nobody could get in to help her; is that correct?

A. That's correct.

Q. And she told you that Brion Daniels started to hit her with a handgun while punching and kicking her about the body; is that correct?

A. Yes.

Q. And she told you that the defendant, who had a handgun in his hand, demanded and said to [the victim] 'suck my dick;' is that correct?

A. That's correct.

Q. And she told you that after Brion Daniels said that he then placed his penis in her mouth; is that correct?

A. That's correct.

Q. She then told you that she thought she had passed out at this point from the agony and pain inflicted by Brion Daniels?

A. Yes.

Q. She also told you that she thought she had passed out at this point from the agony and pain inflicted by Brion Daniels?

A. Yes.

Q. She also told you that she lay there bleeding when Brion Daniels left the washroom; is that correct?

A. That's correct.

Q. She also told you that because of the beating she had [lost] consciousness and lost control of her facilities [sic] and urinated in her pants; is that correct?

A. That's correct.

Q. She also told you that she had regained consciousness and got herself up and walked into a bedroom; is that correct?

A. That's correct.

Q. And changed her pants?

A. Yes.

Q. She also told you that Brion Daniels was leaving by way of the front door when the police arrived; is that correct?

A. That's correct.

Q. And she also told you that, referring to Brion, he [had] seen the police and ran out the back door only to be caught by the police; is that correct?

A. That's correct.

Q. And [she] denied ever being intimate with or a girlfriend to the defendant, Brion Daniels; is that correct?

A. That's correct."

The State contends that defendant has waived any error in connection with this testimony because he failed to object at trial and did not raise the issue in a posttrial motion. We agree. Defendant nonetheless urges this court to review the issue based on plain error.

"The purpose of the plain error rule is to afford certain protections to the accused by correcting serious injustices and to preserve the integrity and reputation of the judicial process." *People v. Vargas*, 174 Ill. 2d 355, 363, 673 N.E.2d 1037, 1041 (1996), citing *People v. Young*, 128 Ill. 2d 1, 46, 538 N.E.2d 461 (1989); see also *People v. Keene*, 169 Ill. 2d 1, 17, 660 N.E.2d 901, 910 (1995) (purpose of the plain error doctrine is to correct errors so serious that they undermine the fairness of the trial). The plain error rule is not a general savings clause for alleged errors. *People v. Garrett*, 276 Ill. App. 3d 702, 709, 658 N.E.2d 1216, 1221-22 (1995), citing *People v. Easley*, 148 Ill. 2d 281, 592 N.E.2d 1036 (1992). In order for a reviewing court to apply the doctrine, the alleged error must affect substantial rights or the evidence must be closely balanced. *Keene*, 169 Ill. 2d at 18, 660 N.E.2d at 910. Assuming *arguendo* that the admission of the victim's prior consistent statements was error because it improperly bolstered the

victim's testimony, the admission of the statements does not implicate a substantial right. *Keene*, 169 Ill. 2d at 18, 660 N.E.2d at 910 (finding plain error doctrine inapplicable and explaining that even assuming that prior consistent statements were used improperly to bolster the witness's credibility, the claim did not implicate a substantial right). In addition, the evidence was not closely balanced in this case. We therefore decline to address the merits of this issue.

■ Defendant next argues that he was prejudiced by certain evidence which he contends was irrelevant. Specifically, defendant argues that (1) the photograph of him taken at the time of the offense suggested to the jury that he looked like the type of person who would commit the crime and that he was trying to fool the jury during trial with his neat appearance; (2) it was improper for the jury to hear that he did not have a permit for his gun; and (3) it was improper for the State to argue that the victim sustained a torn spleen.

At the outset, we note that these three issues have been waived because defendant did not object during trial or include the issue in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988). Because the rule of waiver is a limitation on the parties, and not on the reviewing court, a reviewing court may ignore it if necessary in order to ensure the maintenance of a sound and uniform body of precedent. *People v. Lowe*, 153 Ill. 2d 195, 199-200, 606 N.E.2d 1167, 1170 (1992); *Hux v. Raben*, 38 Ill. 2d 223, 224-25, 230 N.E.2d 831, 832 (1967). For this reason, we choose to address these issues.

We first consider defendant's argument that the photograph of him taken at the time of the offense, in which he "looked somewhat ragged," should not have been admitted because it suggested to the jury that he looked like the type of person that would commit the crime and that he was trying to fool the jury during trial with his neat appearance. The primary requirements for the admissibility of a photograph are those of relevancy and accuracy. *People v. Loferski*, 235 Ill. App. 3d 675, 685, 601 N.E.2d 1135 (1992). Defendant has not contended that the photograph was not accurate, but only argues that the photograph was irrelevant and prejudicial. He claims that the photograph was irrelevant because his identity was not in issue. Nonetheless, even though the defendant fails to contest an issue or is even willing to stipulate to a fact, it is well settled that "the prosecution is not disabled at trial from proving every element of the charged offense and every relevant fact." *People v. Bounds*, 171 Ill. 2d 1, 46, 662 N.E.2d 1168 (1995); *People v. Willis*, 299 Ill. App. 3d 1008, 1020, 702 N.E.2d 616, 624 (1998). To sustain a conviction, one of the elements that the State must prove beyond a reasonable doubt is that the defendant was

the perpetrator of the charged crime. *People v. Dante*, 35 Ill. 2d 538, 540, 221 N.E.2d 409, 410 (1966); *People v. McDonald*, 227 Ill. App. 3d 92, 98, 590 N.E.2d 1003, 1008 (1992). The photograph was accurate and relevant. Defendant was not unfairly prejudiced by its admission. Hence, we conclude that the admission of the photograph of defendant taken at the time of the offense was not reversible error.

Defendant also argues that the State improperly elicited evidence of another crime, that he carried a handgun without a permit, and that this evidence was not relevant to the charged crime of aggravated criminal sexual assault or to the issue of whether he forced the victim to perform oral sex. Defendant admitted to carrying a gun for his protection. He also admitted that he was carrying a gun on March 12, 1998. While questioning defendant about the gun, the prosecutor asked defendant if he had a permit to carry the gun. Defendant responded that he did not. Defendant argues that, in asking the question, the State suggested that defendant was also guilty of unlawful use of a weapon.

There is no dispute that the fact that defendant did not have a permit for the gun he carried was not relevant to the charged offense. Unless relevant, evidence that suggests or implies that the defendant has engaged in prior criminal activity should not be admitted. *People v. Nieves*, 193 Ill. 2d 513, 529, 739 N.E.2d 1277, 1284 (2000). Nonetheless, our supreme court has repeatedly held that the improper introduction of other-crimes evidence is harmless error when a defendant is neither prejudiced nor denied a fair trial based upon its admission. See, *e.g., Nieves*, 193 Ill. 2d at 530, 739 N.E.2d at 1285 (and cases cited therein). Defendant asserts that he was prejudiced, but we disagree. The isolated reference to the lack of a permit for a gun, although improper, was harmless in view of the overwhelming evidence of defendant's guilt of the charged crime of aggravated criminal sexual assault.

Defendant next asserts that the State acted improperly in emphasizing a fact not supported by the evidence, namely, that the victim sustained a "torn spleen." During opening statements, the prosecutor stated, "Dr. Tellez will speak to you in a little while. He will explain the extent of the injuries. Aside from the bruising, the swelling, her spleen was torn. [The victim] has a torn spleen as a result of these injuries that were sustained." During direct examination of Dr. Tellez by the State, the following colloquy took place:

> "Q. Were you also able to examine her back and her internal organs?
> A. We did x-rays of her neck, x-rays of the spine and lower back, as well as chest x-rays and pelvic x-rays of the pelvis.

Q. What were your initial observations based on these tests?

A. Initially we had no—there were no obvious surgical lesions as far as the CAT scan of the head. In the CAT scan of the abdomen there was a question of whether or not she had a tear or a cut within the spleen, which is an organ that's up in the left side right underneath your rib cage here. So there is a question whether or not this was torn (indicating).

Q. And how did you reach that conclusion as to whether or not the spleen was torn?

A. By the CAT scan of the abdomen there was—by looking at it there is a tear or a cut through one of the x-ray—the slices of the spleen itself.

Q. You could see that?

A. That's correct."

On cross-examination by defense counsel, Dr. Tellez testified as follows:

"Q. *** You thought that there was a possibility that there was a lacerated spleen; is that correct?

A. That's correct.

Q. And you ordered a—I think you called it a fancy type of x-ray. What was it computerized demography [*sic*]?

A. That's correct.

Q. And that's the procedure that you explained to these folks that was used to determine whether or not there was a tear; is that right?

A. That's correct.

Q. Now, the results of that test were that you couldn't really say whether there was a tear or there wasn't a tear; isn't that true?

A. That's correct.

Q. It said that it might be—what you saw on the film might represent a small cleft in the spleen; is that correct?

A. That's correct.

Q. So as you sit here today, you really can't say within a reasonable degree of medical certainty whether or not she in fact had a lacerated spleen, can you?

A. That's correct."

In closing argument, the prosecutor argued, "Her spleen was torn. He examined her spleen in an x-ray. He saw the tear with his own eyes." In response, defense counsel restated the doctor's testimony that he could not conclude whether the spleen was torn. In its rebuttal closing argument, the State argued "the doctor told you that it was lacerated. He didn't just make it up." Defendant now argues that the State acted improperly during opening statement and closing argument.

No statement may be made in opening statements that counsel

does not intend to prove or that counsel cannot prove. *People v. Kliner*, 185 Ill. 2d 81, 127, 705 N.E.2d 850, 874 (1998). Nevertheless, "[r]eversible error occurs only where the prosecutor's opening comments are attributable to deliberate misconduct of the prosecutor *and* result in substantial prejudice to the defendant." (Emphasis in original.) *People v. Kliner*, 185 Ill. 2d at 127, 705 N.E.2d at 874. Defendant has contended that the opening remarks were attributable to deliberate misconduct based upon the fact that the State had previously amended count three of the indictment to remove the words "damage to spleen." We do not believe that amending an indictment necessarily means that the prosecution was not going to provide evidence to prove that the victim sustained a torn spleen.

Moreover, the prosecutor's comments here did not result in any substantial prejudice to defendant such that absent the comment the result of the trial would have been different. See *People v. Pasch*, 152 Ill. 2d 133, 184-85, 604 N.E.2d 294 (1992) (unless prosecutor's remarks resulted in substantial prejudice to the accused, such that absent those remarks the verdict would have been different, the verdict must not be disturbed). Defendant was charged with aggravated criminal sexual assault based upon bodily harm. The jury was able to view the photographs taken of the victim at the hospital that showed how her face was severely bruised and swollen. The bodily harm element was clearly proven beyond a reasonable doubt. The evidence of defendant's guilt was overwhelming. The remarks about the torn spleen would not have changed the verdict. Moreover, with respect to the prosecutor's comments during closing argument, we believe that they constituted proper inferences based upon the evidence. The prosecutor's remarks during opening statement and closing argument do not constitute reversible error.

■ Defendant's final argument is that his counsel was ineffective for failing to request an instruction for aggravated battery and for using "derogatory terms" when referring to defendant during closing argument. In order to establish ineffective assistance of counsel, a defendant must prove both (1) that his counsel's performance was deficient and (2) that he was prejudiced by that deficiency. *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525-26, 473 N.E.2d 1246, 1255 (1984). Applying this standard, we conclude that the conduct of defendant's trial counsel was not ineffective.

Defendant's argument here includes an assertion that aggravated battery is a lesser included offense of aggravated criminal sexual assault—an assertion with which the State disagrees. We need not address this particular assertion because, even were we to agree with de-

fendant, we conclude that trial counsel was not ineffective for failing to request the instruction. When a defendant raises a claim of ineffective assistance of counsel he must overcome a strong presumption that the challenged action was one of sound trial strategy. *People v. Williams*, 147 Ill. 2d 173, 235, 588 N.E.2d 983 (1991). The Illinois Supreme Court has recognized that defense counsel may employ a trial strategy of presenting jurors with a lesser-offense instruction in order to prevent a compromise verdict and to force the jury to find defendant guilty or innocent of the more serious offense. See *People v. Barnard*, 104 Ill. 2d 218, 231-32, 470 N.E.2d 1005, 1009-10 (1984). Defendant has failed to overcome the strong presumption that any decision on the part of his counsel not to request an instruction on aggravated battery was one of trial strategy.

The same holds true with defense counsel's purported derogatory comments regarding defendant. Defendant, at the time of his arrest, admitted hitting the victim. While it is true that defense counsel referred to defendant, who had testified and admitted to punching the victim five times in her head, as a "thug" and a "bully," he did so in the context of attempting to distinguish defendant's admitted offenses from the more serious charged offense of aggravated criminal sexual assault. This trial strategy is abundantly clear from the following comments made by defense counsel during his closing argument:

"Like I said, it is not a popularity contest. I don't care if you like him. I certainly don't expect you to like the fact that he slapped her around and punched her around. But he is not charged with that. He is charged with a very serious sexual assault charge, and he said he didn't do it. He is not going to win any popularity contest. He is a bully. He's a thug. But he is not a sex offender."

Assessing the requirements of the first prong of *Strickland*, defendant's trial counsel's representation did not fall below an objective standard of reasonableness. Rather, defense counsel acted appropriately given the evidence available at the time of defendant's trial. In light of the overwhelming evidence demonstrating defendant's guilt, defense counsel's decision was mere trial strategy. Hence, since defendant has failed to satisfy the first prong of the *Strickland* test, the second prong need not be addressed.

For all of the above reasons, we affirm defendant's conviction and sentence for aggravated criminal sexual assault based on bodily harm; pursuant to *People v. King*, 66 Ill. 2d 551, 363 N.E.2d 838 (1977)

defendant's conviction and sentence for aggravated criminal sexual assault based upon the display of a dangerous weapon is vacated.

Affirmed in part; vacated in part.

O'BRIEN and O'MARA FROSSARD, JJ., concur.