SIXTH DIVISION
 May 17, 2002

No. 1-99-3051

THE PEOPLE OF THE STATE OF ILLINOIS,

 Plaintiff-Appellee,

 v.

BRION DANIELS,

 Defendant-Appellant.

 | | | | | |
)))))))))) |Appeal from the
Circuit Court of
Cook County

Honorable
DENNIS A. DERNBACH
Judge Presiding.

 PRESIDING JUSTICE GALLAGHER delivered the opinion of the court:

 After a jury trial, defendant, Brion Daniels, was convicted of two
counts of aggravated criminal sexual assault and sentenced to a concurrent
term of 22 years' imprisonment. On appeal, defendant contends: (1) one of
his convictions for aggravated criminal sexual assault must be reversed as
in violation of the one-act, one-crime rule because both convictions were
based on the same physical act, (2) his conviction for aggravated criminal
sexual assault based upon the display of a dangerous weapon must be vacated
because the State failed to prove the presence of a dangerous weapon during
the course of the sexual assault, (3) he was denied a fair trial where the
State improperly elicited prior consistent statements of the victim, (4)
the State improperly elicited irrelevant evidence which served only to
prejudice the jury against defendant, and (5) his counsel was ineffective
for failing to request an instruction for the lesser-included offense of
aggravated battery. We affirm in part and vacate in part.
 The following evidence was adduced at trial. The victim in this case
testified that, in March of 1998, she and her boyfriend, Robert Garland,
lived near her sister, Tawana Pouncey, who lived at 7241 S. Evans in
Chicago. The victim had known defendant for about one year because he
lived next door to Tawana and would sometimes visit.
 On March 12, 1998, the victim woke up around 2 p.m. because she had
been drinking and smoking crack the night before. Around 3:30 p.m, her 11-
year-old niece, Monica Pouncey, came over to visit her. Later that
evening, between 7:30 and 8 p.m., the victim walked Monica back to her
house at 7241 S. Evans. They walked inside and saw Tawana's boyfriend,
Gerald Nalls, and defendant sitting in the front room. The victim walked
into the front room and sat on the couch. Monica went into the kitchen.
 After the victim sat down, defendant accused her of giving a man oral
sex in the alley. The victim denied it, but defendant continued to accuse
her of giving oral sex to a man in the alley. The victim told defendant
that it was "none of his business" because "he wasn't [her] man."
 The victim testified that after their argument "something popped
[her] in the head." Defendant had hit her in the head with the butt of a
gun. Feeling dizzy, the victim started to stand up. Defendant told her to
sit back down because "[he] was going to kill [her]." She sat back down on
the couch, but then got up to go into the bathroom. In the bathroom, she
saw a "big knot upside [her] head." Defendant came into the bathroom and
closed and locked the door. He then hit her in the head numerous times and
she fell to the floor. Defendant continued to hit and kick her. The
victim urinated and had a bowel movement on herself.
 Defendant told her to get up off the floor and told her to "suck his
dick." The victim had her eyes closed but felt defendant put his penis in
her mouth and ejaculate. Defendant then walked out of the bathroom and the
victim spit defendant's ejaculate in the toilet. She then walked out of
the bathroom and saw the police. She told the police that defendant ran
out the back door. The victim was transported by ambulance to Northwestern
Memorial Hospital.
 At the hospital, photographs were taken of the victim. She testified
that she had a knot over her left eyebrow, bruises and a black eye. The
victim denied ever dating defendant, having sexual relations with defendant
or taking money from him for sex.
 Dr. Geno Tellez, a surgeon at Northwestern Memorial Hospital,
testified that he examined and treated the victim on March 12 and 13 of
1998. When he first examined her, she was complaining of facial pain, head
pain, abdominal pain, and lower back pain. She told the doctor that she
had been beaten and "pistol whipped." Dr. Tellez noticed that she had
soiled her clothes and evaluated her to check for serious injuries.
Several X rays, including CAT scans, were performed to evaluate her
injuries.
 Dr. Tellez testified on direct examination that the X rays revealed
that there was a tear in her spleen; however, during cross-examination he
stated that there was a "possibility" that the victim had a torn spleen.
He also testified that the victim had fractured ribs. There was no need to
operate because she had no signs of internal bleeding. He further
testified that spleen and rib injuries were consistent with kicking or
punching to the body.
 After examining the victim's rib area, he examined her face and head
and stated that her face was "extremely swollen" and there were abrasions,
lacerations, blood and swelling around her eyes. She had fractures to her
nasal bones and suffered a fracture to her lower lumbar vertebrae, which
was consistent with a "violent punch or kick." Additionally, Dr. Tellez
testified that the divot mark on the victim's forehead and her facial
injuries were consistent with a "blow from a hard metal object like the
butt of a handgun."
 The victim's niece, Monica Pouncey, testified that on March 12, 1998,
she was in the kitchen and saw defendant "clunk" her aunt "upside [her]
head." Monica testified that defendant hit her aunt with the bottom part
of his gun. Monica saw her aunt run into the bathroom. Monica then saw
defendant follow her aunt into the bathroom and close the door. Monica
heard her aunt screaming. Because there was no telephone at Monica's
house, she left the house to go call the police. Monica ran back to her
aunt's house, but never called the police.
 Chicago police officer Word testified that on the evening of March
12, 1998, he and his partner were writing a parking ticket when Robert
Garland came up to him and told them of a battery at 7241 S. Evans. When
Officer Word arrived, he saw defendant stick his head out of the front door
and immediately close it. Officer Word entered the house and saw the
victim, who shouted, "he is trying to kill me." The victim pointed to the
back door and Officer Word walked out the back and saw defendant standing
in the yard holding a handgun. Defendant tossed his gun to the ground and
ran towards the front of the house. Defendant was arrested and his gun was
recovered. Officer Word further testified that he remembered handcuffing
defendant and defendant was not wearing any jewelry on his hands. Officer
Word went back into the house and the victim told him that defendant had
hit her face with his gun and that he forced her to perform oral sex.
Officer Word observed that the victim's face was very swollen, she had lots
of contusions and bruises all over her face, and she was slumped over
because she said her stomach "was hurting her real bad." The left side of
her face was swollen shut, and she had blood all around her face.
 Defendant testified in March of 1998, he lived with his mother and
father next door to Tawana Pouncey. He testified that he had a neighborly
relationship with the victim until December 24, 1997. He testified that on
December 24, 1997, and on January 2, 1998, he paid the victim $20 for oral
sex. He maintained that he had paid the victim money in exchange for sex
on numerous occasions. Defendant stated that he and the victim stayed at
the Skyway Motel on January 30 and 31 of 1998, and he paid her money for
sex. She would leave the motel with defendant's money and return with
cocaine. Defendant further testified that, while his parents were out of
town, the victim would stay at his house and he would pay her money for
intercourse and oral sex.
 Defendant testified that, on March 10, 1998, the victim stayed at his
house and watched videos. She left at 5:30 a.m. and he let her borrow two
videos. When defendant got up at 10:30 a.m., he noticed that $35 and his
gold chain were missing.
 On March 12, 1998, defendant testified that Gerald Nalls had invited
him over to his apartment. Later, the victim and her niece arrived.
Defendant testified that the victim came in the front room and that he
could smell alcohol on her. The victim told him "[y]ou don't know what I
had been through." Defendant accused her of taking his chain and money and
not returning the videos. The victim told him they would talk about it
later and pulled out a crack pipe and some drugs. Defendant got angry and
smacked the victim with the back of his right hand. He stated that he was
wearing a ring on his right hand at the time. Defendant swung again, but
the victim pushed his arm and he then hit the cocktail table and the victim
in the face. The victim continued to smoke crack. Gerald Nalls told
defendant his hand was bleeding, so defendant went into the bathroom.
 Defendant next testified that the victim followed him into the
bathroom and tried to hug him. He pushed her away from him and "smacked
her in the face" with his right fist. Defendant testified that the victim
told him she could get his videos and gold chain, but she needed some money
to do it because she owed some drug dealers some money. He testified that
he hit her again, but this time he did it with an open left hand; he
smacked her across the side of her face. Defendant testified that the
victim then closed the door and that she, while sitting on the toilet seat,
pulled defendant towards her and unzipped his zipper. Defendant testified
that the victim tried to perform oral sex on him, but he shoved her head
back. He then left the bathroom and began looking for his jacket. He
admitted that he carried a gun in his jacket, but stated that he did not
hit the victim with a gun and did not take it out in front of her. He
found his jacket and headed for the back door. He fumbled through his
wallet to make sure he had everything. When he reached the back porch, he
heard Gerald Nalls say "he's in there and he [sic] got a gun in his
jacket." Defendant testified that he then put the wallet back in his
jacket, threw the gun into his backyard, put his jacket on, crossed over to
his yard, and walked to the front gate. The police arrested defendant,
handcuffed him and patted him down. They took him to the police station.
He was then taken to the hospital where his hand was bandaged.
 Detective William Halloran testified that on March 12, 1998, he
interviewed the victim and her niece, Monica. Monica told him that she saw
defendant hit her aunt in the head twice with his fist and that she did not
see a gun. She told him she saw her aunt run into the bathroom and that
defendant followed her in and closed and locked the door. Detective
Halloran interviewed the victim at the hospital, and she told him that
defendant had started asking her questions about her personal life and had
accused her of being with someone named "Junior." When defendant did not
like her answers, he had punched her in the face twice. The victim did not
mention to the detective that defendant hit her with a gun while in the
living room. However, she did tell him that defendant started to hit her
with a handgun and kick her after he had followed her into the bathroom and
locked the door. She also told the detective that defendant, who had a
handgun in his hand, demanded that she "suck his dick." She told the
detective that she had never been intimate with defendant before. She told
him that she thought she may have passed out, but she remembered leaving
the bathroom and seeing defendant look out the front door but then leave
out the back door.
 Defendant's father testified that he had seen the victim in his house
on two occasions. He testified that he once saw her naked in his bathroom.
 In rebuttal, Assistant State's Attorney (ASA) Chamberlain testified
that she interviewed defendant on March 13, 1998. ASA Chamberlain prepared
a handwritten statement and defendant read it, reviewed it, signed each
page and initialed each correction. Defendant told her that he had only
had sex with the victim one time and he "really couldn't recall it." He
stated that he had started to have feelings for the victim and on March 12,
1998, he got into an argument with the victim over someone named "Junior."
Defendant stated that before that date, the victim was at Tawana's house
with Junior. Defendant became "hurt and upset" that the victim was with
Junior, so he shot out Junior's windows. Defendant stated that the victim
had told him that she wanted to be with him and that Robert Garland was not
her boyfriend. Defendant further stated that, on March 12, 1998, he asked
the victim if she had been with Junior and she answered "no." He became
angry and asked her again and she finally answered "yes." He jumped up and
hit her in the face twice. He told ASA Chamberlain that he followed the
victim into the bathroom. He locked the door and continued to hit the
victim and sprained his hand in the process. Defendant additionally stated
that, while in the bathroom, the victim offered and gave him a "blow job."
Defendant told ASA Chamberlain that he walked out of the bathroom and saw
the police outside the front door, so he left out the back door. Defendant
admitted to throwing his gun over a fence because he did not want to get
caught with it. Defendant never informed ASA Chamberlain that he had an
ongoing relationship with the victim or mentioned anything about missing
money or a gold chain.
 During his testimony, defendant admitted to meeting with ASA
Chamberlain and admitted signing his six-page statement prepared by ASA
Chamberlain, but denied ever reviewing it. Defendant denied almost his
entire statement that ASA Chamberlain testified to. He testified that he
informed ASA Chamberlain of all the sexual encounters that he had testified
to. He stated that he told ASA Chamberlain about his missing gold chain
and money. He admitted to ASA Chamberlain that he carried a gun for
protection despite not having a permit for it.
 Defendant first argues that one of his convictions for aggravated
criminal sexual assault must be reversed as being in violation of the one-
act, one-crime rule because both convictions were based on the same
physical act. The State concedes that, under People v. King, 66 Ill. 2d
551, 363 N.E.2d 838 (1977), defendant cannot be convicted of two counts of
aggravated criminal sexual assault where there was only one act of sexual
penetration to one victim.
 When multiple convictions of greater and lesser offenses are obtained
for offenses arising from a single act, a sentence should be imposed on the
most serious offense and the convictions on the less serious offenses
should be vacated. People v. Garcia, 179 Ill. 2d 55, 71, 688 N.E.2d 57, 64
(1997). Where, as here, the two convictions are for the same class of
offense, we look to whether one offense requires a more culpable mental
state than the other. People v. Calva, 256 Ill. App. 3d 865, 628 N.E.2d
856, 860 (1993). In Garcia, our supreme court stated that "when multiple
convictions for aggravated criminal sexual assault are obtained from a
single act of penetration, there is no way to determine the most serious
conviction because none of the convictions involve either a more or less
culpable mental state." Garcia, 179 Ill. 2d at 71, 688 N.E.2d at 64-65.
Here, however, one of defendant's convictions was for aggravated criminal
sexual assault based upon the display of a dangerous weapon and the other
was for aggravated criminal sexual assault based on bodily harm to the
victim. Thus, the present case is distinguishable from Garcia. We
conclude that we should affirm defendant's conviction for aggravated
criminal sexual assault based on bodily harm to the victim, which requires
a more culpable mental state than aggravated criminal sexual assault based
upon the display of a dangerous weapon. See People v. Olsen,161 Ill. App.
3d 945, 950, 514 N.E.2d 233, 237 (1987)(concluding that, as between two
convictions for aggravated criminal sexual assault predicated upon one act
of sexual penetration, court would vacate conviction that had as its
aggravating factor the display of a dangerous weapon, which was "somewhat
less serious" than conviction based upon causing bodily harm to the
victim); see also People v. Gutierrez,156 Ill. App. 3d 555, 509 N.E.2d 787
(1987)(also retaining aggravated criminal sexual assault conviction based
on bodily harm as opposed to conviction based upon age of defendant and age
of victim, who was 12 years old). We therefore vacate defendant's
conviction and sentence for aggravated criminal sexual assault based upon
the display of a dangerous weapon. In view of this decision, we need not
address the second issue raised by defendant as to whether the State proved
beyond a reasonable doubt that defendant displayed a weapon during the
course of the sexual assault.
 Defendant's next contention is that he was denied a fair trial where
the State improperly elicited, from Detective Halloran, prior consistent
statements of the victim, even though there had been no allegations of
recent fabrication or motive to testify falsely. Defendant contends that
this testimony of Detective Halloran improperly bolstered the victim's
testimony.
 The defense called Detective Halloran in its case in chief to impeach
the victim's testimony that defendant hit her with the butt of the gun in
the living room. Detective Halloran testified that the victim never told
him that defendant had hit her in the face with a pistol while in the
living room, but had only told him that defendant had punched her. The
State cross-examined Detective Halloran and elicited the following:
 "Q. [The victim] did tell you that when she went in the bathroom
 she saw her face was bleeding?
 A. Yes.
 Q. She also told you that after she had made the statement that
 Brion Daniels came into the bathroom, closed the door and locked it,
 that she couldn't get out and nobody could get in to help her; is that
 correct?
 A. That's correct.
 Q. And she told you that Brion Daniels started to hit her with a
 handgun while punching and kicking her about the body; is that
 correct?
 A. Yes.
 Q. And she told you that the defendant, who had a handgun in his
 hand, demanded and said to [the victim] 'suck my dick;' is that
 correct?
 A. That's correct.
 Q: And she told you that after Brion Daniels said that he then
 placed his penis in her mouth; is that correct?
 A. That's correct.
 Q. She then told you that she thought she had passed out at this
 point from the agony and pain inflicted by Brion Daniels?
 A. Yes.
 Q. She also told you that she thought she had passed out at this
 point from the agony and pain inflicted by Brion Daniels?
 A. Yes.
 Q. She also told you that she lay there bleeding when Brion
 Daniels left the washroom; is that correct?
 A. That's correct.
 Q. She also told you that because of the beating she had [lost]
 consciousness and lost control of her facilities [sic] and urinated in
 her pants; is that correct?
 A. That's correct.
 Q. She also told you that she had regained consciousness and got
 herself up and walked into a bedroom; is that correct?
 A. That's correct.
 Q. And changed her pants?
 A. Yes.
 Q. She also told you that Brion Daniels was leaving by way of
 the front door when the police arrived; is that correct?
 A. That's correct.
 Q. And she also told you that, referring to Brion, he [had] seen
 the police and ran out the back door only to be caught by the police;
 is that correct?
 A. That's correct.
 Q. And [she] denied ever being intimate with or a girlfriend to
 the defendant, Brion Daniels; is that correct?
 A. That's correct."
The State contends that defendant has waived any error in connection with
this testimony because he failed to object at trial and did not raise the
issue in a post-trial motion. We agree. Defendant nonetheless urges this
court to review the issue based on plain error.
 "The purpose of the plain error rule is to afford certain protections
to the accused by correcting serious injustices and to preserve the
integrity and reputation of the judicial process." People v. Vargas, 174
Ill. 2d 355, 363, 673 N.E.2d 1037, 1041 (1996), citing People v. Young,
128 Ill. 2d 1, 46, 538 N.E.2d 461 (1989); see also People v. Keene, 169
Ill. 2d 1, 17, 660 N.E.2d 901, 910 (1995)(purpose of the plain error
doctrine is to correct errors so serious that they undermine the fairness
of the trial). The plain error rule is not a general savings clause for
alleged errors. People v. Garrett, 276 Ill. App. 3d 702, 709, 658 N.E.2d
1216, 1221-22 (1995), citing People v. Easley, 148 Ill. 2d 281, 592 N.E.2d
1036 (1992). In order for a reviewing court to apply the doctrine, the
alleged error must affect substantial rights or the evidence must be
closely balanced. Keene, 169 Ill. 2d at 18, 660 N.E.2d at 910. Assuming
arguendo that the admission of the victim's prior consistent statements was
error because it improperly bolstered the victim's testimony, the admission
of the statements does not implicate a substantial right. Keene, 169 Ill.
2d at 18, 660 N.E.2d at 910 (finding plain error doctrine inapplicable and
explaining that even assuming that prior consistent statements were used
improperly to bolster the witness's credibility, the claim did not
implicate a substantial right). In addition, the evidence was not closely
balanced in this case. We therefore decline to address the merits of this
issue.
 Defendant next argues that he was prejudiced by certain evidence
which he contends was irrelevant. Specifically, defendant argues that (1)
the photograph of him taken at the time of the offense suggested to the
jury that he looked like the type of person who would commit the crime and
that he was trying to fool the jury during trial with his neat appearance;
(2) it was improper for the jury to hear that he did not have a permit for
his gun; and (3) it was improper for the State to argue that the victim
sustained a torn spleen.
 At the outset, we note that these three issues have been waived
because defendant did not object during trial or include the issue in a
post-trial motion. People v. Enoch, 122 Ill. 2d 176, 186, 522 N.E.2d 1124,
1130 (1988). Because the rule of waiver is a limitation on the parties,
and not on the reviewing court, a reviewing court may ignore it if
necessary in order to ensure the maintenance of a sound and uniform body of
precedent. People v. Lowe, 153 Ill. 2d 195, 199-200, 606 N.E.2d 1167, 1170
(1992); Hux v. Raben, 38 Ill. 2d 223, 224-25, 230 N.E.2d 831, 832 (1967).
 For this reason, we choose to address these issues.
 We first consider defendant's argument that the photograph of him
taken at the time of the offense, in which he "looked somewhat ragged,"
should not have been admitted because it suggested to the jury that he
looked like the type of person that would commit the crime and that he was
trying to fool the jury during trial with his neat appearance. The primary
requirements for the admissibility of a photograph are those of relevancy
and accuracy. People v. Loferski, 235 Ill. App. 3d 675, 685, 601 N.E.2d
1135 (1992). Defendant has not contended that the photograph was not
accurate, but only argues that the photograph was irrelevant and
prejudicial. He claims that the photograph was irrelevant because his
identity was not in issue. Nonetheless, even though the defendant fails to
contest an issue or is even willing to stipulate to a fact, it is well
settled that "the prosecution is not disabled at trial from proving every
element of the charged offense and every relevant fact." People v. Bounds,
171 Ill. 2d 1, 46, 662 N.E.2d 1168 (1995); People v. Willis, 299 Ill. App.
3d 1008, 1020, 702 N.E.2d 616, 624 (1998). To sustain a conviction, one
of the elements that the State must prove beyond a reasonable doubt is that
the defendant was the perpetrator of the charged crime. People v. Dante, 35
Ill. 2d 538, 540, 221 N.E.2d 409, 410 (1966); People v. McDonald, 227 Ill.
App. 3d 92, 98, 590 N.E.2d 1003, 1008 (1992). The photograph was accurate
and relevant. Defendant was not unfairly prejudiced by its admission.
Hence, we conclude that the admission of the photograph of defendant taken
at the time of the offense was not reversible error.
 Defendant also argues that the State improperly elicited evidence of
another crime, that he carried a handgun without a permit, and that this
evidence was not relevant to the charged crime of aggravated criminal
sexual assault or to the issue of whether he forced the victim to perform
oral sex. Defendant admitted to carrying a gun for his protection. He
also admitted that he was carrying a gun on March 12, 1998. While
questioning defendant about the gun, the prosecutor asked defendant if he
had a permit to carry the gun. Defendant responded that he did not.
Defendant argues that, in asking the question, the State suggested that
defendant was also guilty of unlawful use of a weapon.
 There is no dispute that the fact that defendant did not have a
permit for the gun he carried was not relevant to the charged offense.
Unless relevant, evidence that suggests or implies that the defendant has
engaged in prior criminal activity should not be admitted. People v.
Nieves, 193 Ill. 2d 513, 529, 739 N.E.2d 1277, 1284 (2000). Nonetheless,
our supreme court has repeatedly held that the improper introduction of
other-crimes evidence is harmless error when a defendant is neither
prejudiced nor denied a fair trial based upon its admission. See, e.g.,
Nieves, 193 Ill. 2d at 530, 739 N.E.2d at 1285 and cases cited therein.
Defendant asserts that he was prejudiced, but we disagree. The isolated
reference to the lack of a permit for a gun, although improper, was
harmless in view of the overwhelming evidence of defendant's guilt of the
charged crime of aggravated criminal sexual assault.
 Defendant next asserts that the State acted improperly in emphasizing
a fact not supported by the evidence, namely, that the victim sustained a
"torn spleen." During opening statements, the prosecutor stated, "Dr.
Tellez will speak to you in a little while. He will explain the extent of
the injuries. Aside from the bruising, the swelling, her spleen was torn.
[The victim] has a torn spleen as a result of these injuries that were
sustained." During direct examination of Dr. Tellez by the State, the
following colloquy took place:
 "Q. Were you also able to examine her back and her internal
 organs?
 A. We did x-rays of her neck, x-rays of the spine and lower
 back, as well as chest x-rays and pelvic x-rays of the pelvis.
 Q. What were your initial observations based on these tests?
 A. Initially we had no - there were no obvious surgical lesions
 as far as the CAT scan of the head. In the CAT scan of the abdomen
 there was a question of whether or not she had a tear or a cut within
 the spleen, which is an organ that's up in the left side right
 underneath your rib cage here. So there is a question whether or not
 this was torn (indicating).
 Q. And how did you reach that conclusion as to whether or not
 the spleen was torn?
 A. By the CAT scan of the abdomen there was - by looking at it
 there is a tear or a cut through one of the x-ray - the slices of the
 spleen itself.
 Q. You could see that?
 A. That's correct."
On cross-examination by defense counsel, Dr. Tellez testified as follows:
 "Q. *** You thought that there was a possibility that there was
 a lacerated spleen; is that correct?
 A. That's correct.
 Q. And you ordered a - I think you called it a fancy type of x-
 ray. What was it computerized demography [sic]?
 A. That's correct.
 Q. And that's the procedure that you explained to these folks
 that was used to determine whether or not there was a tear; is that
 right?
 A. That's correct.
 Q. Now, the results of that test were that you couldn't really
 say whether there was a tear or there wasn't a tear; isn't that true?
 A. That's correct.
 Q. It said that it might be - what you saw on the film might
 represent a small cleft in the spleen; is that correct?
 A. That's correct.
 Q. So as you sit here today, you really can't say within a
 reasonable degree of medical certainty whether or not she in fact had
 a lacerated spleen, can you?
 A. That's correct."
In closing argument, the prosecutor argued, "Her spleen was torn. He
examined her spleen in an x-ray. He saw the tear with his own eyes." In
response, defense counsel restated the doctor's testimony that he could not
conclude whether the spleen was torn. In its rebuttal closing argument,
the State argued "the doctor told you that it was lacerated. He didn't
just make it up." Defendant now argues that the State acted improperly
during opening statement and closing argument.
 No statement may be made in opening statements that counsel does not
intend to prove or that counsel cannot prove. People v. Kliner, 185 Ill. 2d
 81, 127, 705 N.E.2d 850, 874 (1998). Nevertheless, "[r]eversible error
occurs only where the prosecutor's opening comments are attributable to
deliberate misconduct of the prosecutor and result in substantial prejudice
to the defendant." (Emphasis in original.) People v. Kliner, 185 Ill. 2d
at 127, 705 N.E.2d at 874. Defendant has contended that the opening
remarks were attributable to deliberate misconduct based upon the fact that
the State had previously amended count three of the indictment to remove
the words "damage to spleen." We do not believe that amending an
indictment necessarily means that the prosecution was not going to provide
evidence to prove that the victim sustained a torn spleen.
 Moreover, the prosecutor's comments here did not result in any
substantial prejudice to defendant such that absent the comment the result
of the trial would have been different. See People v. Pasch, 152 Ill. 2d
133, 184-85, 604 N.E.2d 294 (1992)(unless prosecutor's remarks resulted in
substantial prejudice to the accused, such that absent those remarks the
verdict would have been different, the verdict must not be disturbed).
Defendant was charged with aggravated criminal sexual assault based upon
bodily harm. The jury was able to view the photographs taken of the victim
at the hospital that showed how her face was severely bruised and swollen.
The bodily harm element was clearly proven beyond a reasonable doubt. The
evidence of defendant's guilt was overwhelming. The remarks about the torn
spleen would not have changed the verdict. Moreover, with respect to the
prosecutor's comments during closing argument, we believe that they
constituted proper inferences based upon the evidence. The prosecutor's
remarks during opening statement and closing argument do not constitute
reversible error.
 Defendant's final argument is that his counsel was ineffective for
failing to request an instruction for aggravated battery and for using
"derogatory terms" when referring to defendant during closing argument. In
order to establish ineffective assistance of counsel, a defendant must
prove both (1) that his counsel's performance was deficient and (2) that he
was prejudiced by that deficiency. Strickland v. Washington, 466 U.S. 668,
687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984); People v.
Albanese, 104 Ill. 2d 504, 525-26, 473 N.E.2d 1246, 1255 (1984). Applying
this standard, we conclude that the conduct of defendant's trial counsel
was not ineffective.
 Defendant's argument here includes an assertion that aggravated
battery is a lesser included offense of aggravated criminal sexual assault
- an assertion with which the State disagrees. We need not address this
particular assertion because, even were we to agree with defendant, we
conclude that trial counsel was not ineffective for failing to request the
instruction. When a defendant raises a claim of ineffective assistance of
counsel he must overcome a strong presumption that the challenged action
was one of sound trial strategy. People v. Williams, 147 Ill. 2d 173, 235,
588 N.E.2d 983 (1991). The Illinois Supreme Court has recognized that
defense counsel may employ a trial strategy of presenting jurors with a
lesser-offense instruction in order to prevent a compromise verdict and to
force the jury to find defendant guilty or innocent of the more serious
offense. See People v. Barnard, 104 Ill. 2d 218, 231-32, 470 N.E.2d 1005,
1009-10 (1984). Defendant has failed to overcome the strong presumption
that any decision on the part of his counsel not to request an instruction
on aggravated battery was one of trial strategy.
 The same holds true with defense counsel's purported derogatory
comments regarding defendant. Defendant, at the time of his arrest,
admitted hitting the victim. While it is true that defense counsel
referred to defendant, who had testified and admitted to punching the
victim five times in her head, as a "thug" and a "bully," he did so in the
context of attempting to distinguish defendant's admitted offenses from the
more serious charged offense of aggravated criminal sexual assault. This
trial strategy is abundantly clear from the following comments made by
defense counsel during his closing argument.:
 "Like I said, it is not a popularity contest. I don't care if you
 like him. I certainly don't expect you to like the fact that he
 slapped her around and punched her around. But he is not charged with
 that. He is charged with a very serious sexual assault charge, and he
 said he didn't do it. He is not going to win any popularity contest.
 He is a bully. He's a thug. But he is not a sex offender."
Assessing the requirements of the first prong of Strickland, defendant's
trial counsel's representation did not fall below an objective standard of
reasonableness. Rather, defense counsel acted appropriately given the
evidence available at the time of defendant's trial. In light of the
overwhelming evidence demonstrating defendant's guilt, defense counsel's
decision was mere trial strategy. Hence, since defendant has failed to
satisfy the first prong of the Strickland test, the second prong need not
be addressed.
 For all of the above reasons, we affirm defendant's conviction and
sentence for aggravated criminal sexual assault based on bodily harm;
pursuant to People v. King, 66 Ill. 2d 551, 363 N.E.2d 838 (1977)
defendant's conviction and sentence for aggravated criminal sexual assault
based upon the display of a dangerous weapon is vacated.
 Affirmed in part; vacated in part.
 O'BRIEN and O'MARA FROSSARD, JJ., concur.